Argued 24 January, decided 27 March, 1905.

**PACIFIC EXPORT CO. v. NORTH PACIFIC LUMBER CO.**

80 Pac. 105.

QUESTION FOR JURY.

1. The evidence, while conflicting, is quite sufficient to sustain the finding of the jury in plaintiff's favor, and the conclusion thus made will not be reviewed.

TERMS OF CONTRACT A JURY QUESTION.

2. Where a contract, as finally developed, was the result of several conferences and conversations, the question as to what the terms were in its final conclusion was properly submitted to the jury.

CONSTRUCTION OF CONTRACT—MEANING OF TERMS.

3. The employment of the word "sell" in the memoranda exchanged during the preliminary discussion of the terms of a contract, which was the result of several conferences and conversations, is not conclusive, as matter of law, as to the nature of the contract.

REFUSING IRRELEVANT INSTRUCTIONS.

4. Requested instructions not applicable to any theory of either party should be refused.

REFUSING INSTRUCTIONS ALREADY GIVEN.

5. A trial judge need not repeat an instruction that has already been either literally or substantially given.

MEMORANDUM RECEIVED—EVIDENCE OF AS AN ADMISSION.

6. A memorandum of the terms of a proposed contract, prepared by one of the negotiating parties and delivered to the other, who made no objection thereto, is competent in an action involving the terms of the agreement as an admission by the receiving party.

RIGHT OF WITNESS TO EXPLAIN HIS TESTIMONY.

7. A witness is entitled to an opportunity to explain words or expressions used by him in testifying and which he thinks may not have been understood as he meant them.

From Multnomah: ALFRED F. SEARS, JR., Judge.

Statement by MR. CHIEF JUSTICE WOLVERTON.

Action by the Pacific Export Lumber Co. against the North Pacific Lumber Co. Both plaintiff and defendant are corporations.

The plaintiff's cause of action is stated, in substance, as follows: That, prior to November 25, 1901, plaintiff and defendant entered into a contract whereby it was agreed that the defendant should, at its own cost and expense, complete a dredge then in course of construction, and thoroughly equip the same with tools, machinery, appliances, etc., so that nothing else of the kind would be required for its operation, except such as might be needed for subsequent repairs; that a corporation should be formed with a capital stock of $100,000, to be styled the Portland Dredging Co., and empowered to build, acquire, and operate dredges, and to do all things necessary and proper to the carrying on of the dredging business; that, when com-

pleted, the dredge should be conveyed to the dredging company in exchange for $50,000 of its capital stock, the other moiety of its stock to remain in the treasury of the company, to be issued as its business might require; that of the $50,000 so to be issued, one half, or $25,000 thereof, should be delivered to the defendant, and the other half to William D. Wheelwright, the manager for plaintiff, for its account, in consideration for which plaintiff was to pay the defendant the sum of $12,500 in cash; that thereafter, and on or about the day above named, and pursuant to said contract, the defendant caused the Portland Dredging Co. to be duly incorporated and organized with Donald Mackay as president and treasurer, E. T. Williams as vice president and manager, and W. B. Mackay as secretary and assistant manager; that on or about December 26, 1901, the plaintiff, on being informed by defendant that the dredge was completed and the dredging company organized, paid to defendant the sum of $12,500; that thereafter, about January 1, 1902, the defendant transferred and conveyed the dredge to the dredging company, and caused it to be received by such company in payment for 500 shares of its capital stock, the par value being $100 per share, and that ever since the last-named date the dredge has been owned, maintained, and operated by the dredging company; that the officers and directors of the dredging company are all officers and agents of the defendant company; that upon the representation of the defendant that it was desirable to replace the engine then in use in the dredge with a larger and more powerful one, and that the difference between the cost of a new engine and the value of the old would be $6,000, at the request of the defendant, plaintiff, on or about September 9, 1902, paid to defendant the further sum of $3,000, being one half the amount of such difference, whereupon plaintiff demanded that defendant cause to be issued and transferred to plaintiff 250 shares of the capital stock of the dredging company, and thereafter, and especially on February 24, 1903, repeated such demand, but that defendant refused to deliver the same or any part thereof, except 248 shares, which it offered to deliver to plaintiff, but which plaintiff refused

to accept; that on or about said February 24, and in consequence of defendant's refusal to deliver to plaintiff said 250 shares of capital stock of the dredging company, the plaintiff notified defendant that it desired that said contract should be terminated; that thereafter defendant denied and disavowed making or entering into such contract, or that plaintiff was entitled to 250 shares, or any number of shares, of the capital stock of the dredging company, but claimed that plaintiff had purchased of defendant a one-half interest in the dredge, and was liable for one half the expenses in operating the same, and thereby wrongfully repudiated and rescinded said contract; that thereafter, to wit, about June 3, and also on June 10, 1903, the plaintiff, in consequence of said wrongful acts, elected to terminate all contracts and relations existing between plaintiff and defendant regarding said dredge, and demanded of defendant the repayment of the money paid, with interest, which it refused, and plaintiff now demands judgment accordingly.

For answer the defendant avers that on said 25th day of November, 1901, the plaintiff purchased of defendant an undivided one half interest in the dredge then under construction by the defendant at the agreed sum of $12,500; that in said purchase it was agreed by and between plaintiff and defendant that defendant should retain control of the dredge, and maintain and operate it; that it should have the right to employ the same first for its own use, and when so employed defendant should pay for the work done at the actual cost of doing the same; that when employed in general dredging the profits and losses that might arise or be incurred should be shared equally between plaintiff and defendant; that on or about December 26, 1901, the dredge was completed, and plaintiff, in pursuance of its purchase, paid to defendant the sum of $12,500, and that said dredge thereupon became and was thenceforth the joint property of the plaintiff and defendant; that on or about the 9th day of December, 1902, the plaintiff, under its agreement, paid to defendant the further sum of $3,000, being one half the cost of exchanging the engines for use in the dredge; that defendant, for the purpose of retaining control and maintaining and operating said dredge,

and for greater convenience in keeping the accounts thereof, did, on November 25, 1901, cause the Portland Dredging Co. to be incorporated and organized; that on January 9, 1902, at a regular meeting of the board of directors, it was resolved that the dredging company should purchase of plaintiff and defendant, providing they were willing to sell, the said dredge, its business, good will, etc., at the agreed price of $50,000, to be credited upon the subscription to the capital stock; that plaintiff was notified of said acts of the dredging company, but refused to convey its interest in the dredge to said company, and that by reason thereof defendant has not so conveyed its interest; that with the full knowledge and consent of plaintiff the dredging company has been allowed to operate said dredge and keep the accounts thereof; and that plaintiff has, since the 9th day of January, 1902, and up to the 24th day of February, 1903, participated in the management of said dredge; and that in the operation thereof losses have been incurred which the defendant has paid upon the faith of plaintiff's agreement to repay one half thereof to defendant, which it refuses to do; wherefore the defendant prays a dismissal of the action.

There was a judgment for plaintiff, from which defendant appealed.                                        AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Thomas Nelson Strong.*

For respondent there was a brief and an oral argument by *Mr. William Wick Cotton.*

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

1. The most vital difference between the parties litigant relates to a requested instruction that the jury return a verdict for defendant on the ground that the plaintiff's proofs were insufficient to support the action. The parties entertain directly antagonistic theories relative to the initial transaction giving rise to the controversy, which are well portrayed by the pleadings: one insisting that the effect of the agreement was the purchase by the plaintiff of defendant of a specified number of shares of the capital stock of the Portland Dredging Co. thereafter to be

formed, being one half the proposed issue; and the other party that its effect was simply to signify the purchase by plaintiff of the defendant of an undivided one half interest in the dredge to be operated on their joint account, and that the formation of the dredging company and the stock matter were only incidents, not affecting the sale. Owing to the vast volume of testimony in the record, we cannot undertake even to summarize it, nor is it necessary for a decision upon the question indicated. W. D. Wheelwright was the chief witness upon whom the plaintiff relies, and it will be sufficient for the purposes of this inquiry that we follow him in the merest outline of his testimony. The negotiations took place between Wheelwright, as manager of the plaintiff company, and E. T. Williams, of the defendant company. The defendant had in course of construction a dredge, and Wheelwright says he had negotiations with Williams for the purchase of it. When these began is not definitely fixed, but some time in 1901; and the parties concluded that they would form a company, and that each would take half the stock, paid up, to be issued in exchange for the dredge; that he (witness) called his stenographer, and in the presence of Williams dictated the following memorandum of the agreement, which was, however, not signed by the parties, but a carbon copy was given to Williams:

"The North Pacific Lumber Co. sell to Wm. D. Wheelwright one half interest in their new dredge, which is to be entirely finished and thoroughly equipped with all of the tools and appurtenances for the business, and in perfect repair and condition, so that no new machinery, tools or appurtenances will have to be supplied, except as may be needed in the way of repairs in the future.

"A stock company to be formed called the Portland Dredging Co. with a capital of $100,000, of which $50,000 is to be issued in payment for the dredge, one half to the North Pacific Lumber Co. and one half to W. D. W. The other $50,000 to remain in the treasury, to be issued only for cash at par or property at full value—either new property to be acquired or for increase in the value of the company's assets.

"The charter of the company to be a liberal one, giving right to issue bonds, secured by mortgage or otherwise, increase the capital stock, make contracts in any part of the world, build

and acquire dredges or other machinery, hold real estate, make improvements thereon, build wharves, docks, bridges or railroads, etc.

"Officers: President, vice president, treasurer, secretary and three directors, who may fill the office of president, vice president and treasurer."

Continuing, the witness further testified that nothing more was done except they had general conversations from time to time touching the outlook of the business, when, on December 28, Williams telephoned that the dredge was completed, and witness sent him $12,500 by check, but did not receive in return any receipt, nor did he take a bill of sale for the dredge; that it was his purpose to leave the legal ownership free, so that the transfer could be made by the defendant to the dredge company when formed, which was afterwards done; that some time afterwards Williams informed witness that the company had been formed, and that witness was to have one half the stock, but that some fears had been expressed with reference to his holding it, because of the eventual control of the concern, which the defendant company desired to retain; and that Williams proposed to turn over to witness 248 shares, and himself to hold four shares, two on account of the plaintiff and two on account of the defendant, 'which proposal witness declined; and that, after further parley, witness declared that there was nothing else to be done except for Williams to pay back the money and annul the contract. Witness further testified that Williams never refused to give him the 250 shares, and that he felt that sooner or later Williams would turn them over to him; that in the spring (1902) Williams suggested that it would be necessary to replace the old engine in the dredge by a new one, and that witness approved of it, for which there was an added expense, and on account of it witness later (September 9, 1902) paid to Williams $3,000 by his check; that during the summer Williams further suggested that it would be fair that the defendant take the care of the dredge, when idle, at its own expense, in consideration that its own work be done at cost, and this was assented to as satisfactory; that the dredge had then done no work for any other person or company, although witness was under the impression

that it had; that on the day witness sent defendant his check for $3,000 he requested that it render an account of the cost incurred by the change of the engines, with a memorandum of receipts and disbursements, as previously requested, and also that it hand to plaintiff its certificate for stock in the company, meaning the dredging company.

On November 26, 1902, the defendant wrote plaintiff, requesting a check for $1,787.24, which it was stated was due from plaintiff to defendant for one half excess of advances made in payment of sundry bills, to which plaintiff replied on November 29.:

"Our agreement was to purchase one-half interest in a completed dredge, fully equipped for work, on the basis of $25,000.00, and we handed you a check for $12,500.00 on the 26th of December, 1901, in full payment for said half interest. * * You have had entire control and management of the dredge, you have done everything that has been done and have paid every bill that has been paid, so that you are in a much better position to render intelligible accounts than any person that we might select to do so. Then we will examine the accounts and ask for explanations and vouchers if necessary."

On December 5 the defendant replied:

"We agree in the main with what you have set forth."

On the 24th of February, 1903, plaintiff again wrote the defendant as follows, there having been correspondence in the mean while more particularly touching the dredging account between the parties:

"In view of all the facts and circumstances mentioned above, we feel that it is out of the question for us to expect to get along together pleasantly and amicably as equal partners of the ownership of the dredge, and to avoid further controversy we think it better that the contract for the purchase by us of one-half interest in it be rescinded, which we hereby do, and will thank you to consider this letter a notice of such rescission."

Four days later the defendant wrote the plaintiff:

"Your purchase of a one-half interest in the dredge was made independently of incorporating the Portland Dredging Co. and if you are not willing to accept the certificate of 248 shares of its capital stock that we offered to you for your interest in the dredge you had a perfect right to refuse it, and we had no way of forcing it upon you nor did we wish to do so. * * As to any rescission of the original contract or purchase on account of such

small losses as may have been sustained or these long subsequent disputes and controversies the idea is absurd and cannot be entertained for a moment."

On March 3 the plaintiff again wrote the defendant:

"The reasons for the rescission were clearly stated in our letter to you of February 24, viz., the fact that mutual confidence, which is essential to equal ownership and management of property by two parties, no longer exists, and that you have refused to deliver us the 250 shares of stock to which we were entitled."

And again on June 3:

"The incorporation of the Portland Dredging Co. and the transfer of the dredge to that company was from the very beginning a part of our understanding and agreement with you. The Pacific Export Lumber Co. was willing to own stock in the Portland Dredging Co. but it was never our intention to become a partner with you or with any one else in the ownership and operation of the dredge. From the first it was agreed, as we understand it, that the Portland Dredging Co. should be incorporated and that the title to the dredge should be transferred to the Portland Dredging Co. by you, and that the stock in that company should be evenly divided, and upon the faith of this contract our money was advanced. * * We are not aware of any attempt on your part to transfer to us any interest in the dredge, or that we now hold or ever have held any interest in the dredge, but on the contrary have always understood that the title to the dredge was at first in you and was afterwards transferred to the Portland Dredging Co."

On further examination the witness testified that he never had any evidence of ownership in the dredge by certificate or otherwise; that he bought one half the dredge as he has stated, the dredge itself to be set over to the Portland Dredging Co.; that he was to have 250 shares of the stock of that company and the defendant was to have a like number of shares, but that he never received his; that he meant by the expression "bought one half the dredge" that he bought one half the stock of the company that was to own the dredge, but that he did not get it; that witness had not participated in the operation or management of the dredge in any way whatever; that he left that matter to the defendant according to agreement; that he was contented that defendant should incorporate the company and run it. This testimony is corroborated in some material particulars, and beyond

it there was offered in evidence the articles of incorporation of the Portland Dredging Co. and also certain books of account kept with reference to it, showing the organization of the company, the issuance of $50,000 of stock, which was credited to the company against the plant, which was charged to it, and, among others, the adoption of the following resolution, to wit:

"Resolved, That this company purchase of the North Pacific Lumber Co. and Wm. D. Wheelwright the steam dredge lately constructed by the North Pacific Lumber Co. together with all of its appurtenances and all contracts for its employment, and all business, trade and good will connected therewith for the sum of fifty thousand dollars; and that said sum of fifty thousand dollars be credited in full payment of the subscription of Donald Mackay and W. B. Mackay for 248 shares, $24,800.00; E. T. Williams for 252 shares, $25,200.00, to the capital stock of this company, and that upon the receipt of a bill of sale of said dredge and other property from said North Pacific Lumber Co. and the delivery thereto to this company that the president and secretary of this company issue certificates of fully paid-up stock as aforesaid to said Donald Mackay, E. T. Williams and W. B. Mackay or their order."

This indicates the general outline of plaintiff's case as made by the proofs. There is much, as would naturally be supposed from the issues presented by the pleadings, in the defendant's case contradictory of this, but it does not alter the question whether plaintiff has made a case sufficient to be submitted to the jury for their consideration. It is clear to our minds that the plaintiff has substantiated by evidence pertinent to go to the jury every material phase of its theory of the case, and, having done so, the motion for a directed verdict for the defendant was properly denied.

The cursory resume we have made of the evidence indicates that there is some apparent contradiction in the chief witness's testimony and in his letters touching whether the plaintiff's contract was for one-half interest in the dredge, with the formation of the dredging company and the issuance of the stock designated as an incident thereto, or whether it was for 250 shares of the capital stock of the company with the dredge as the incident in the transaction; but this was matter very proper for the jury's

determination. It was one of fact, and the inference drawn was one fairly deducible from the evidence submitted.

2. The contract as finally developed was not one completed at one time, but, was the result of several conferences and conversations, and what the terms were in its final conclusion the jury were to judge.

3. The memoranda relied upon as stating the conditions of the initiatory contract employ the term "sell," and this is relied upon as conveying a present interest in the dredge to Wheelwright; but the term is often used interchangeably as indicating a present sale or a contract to sell, and it must here be read in the light of all the other stipulations of the contract, whatever they were, and, being wholly a matter of fact, it was for the jury to say what the contract was. The word "sell," therefore, has no peculiar significance which the court could declare as matter of law under the conditions present.

It is insisted, further, that plaintiff was not in a position to rescind; that the expenditures made by the defendant in adding to the improvements of the dredge and in operating the same were with witness's full knowledge and consent, and that by not repudiating its acts in that regard promptly, it has ratified the contract, and that it is now too late for it to adopt that remedy, and that its only cause of action, if any it has, is for a breach of contract. The plaintiff replies that defendant first repudiated its contract by refusing to deliver the stock, and denying that any such contract as plaintiff is insisting upon existed. And, furthermore, that it acted promptly when it was advised by the books of the company that the dredge was not being operated as contemplated by the agreement and subsequent modifications thereof; that plaintiff was misled, and had no opportunity of ascertaining what was being done, and, as soon as it was informed of the true conditions from the statements of the books, and was advised that defendant did not intend to deliver the 250 shares of stock in the dredging company, as plaintiff alleges it promised, it rescinded at once, and insists that it had a right so to do. But this question was also a matter for the jury, they having received full and explicit instructions from the court. There

was certainly evidence upon which to base their verdict. In this connection there is a contention that the court was in error in instructing that there was nothing for the defendant to return to the plaintiff in order to place it in statu quo as a prerequisite to rescinding; the rule being that when a contract has been partially executed, and one of the parties has derived substantial benefits, or has imposed upon the others material losses, through the latter's partial performance of the agreement, then the former cannot rescind his contract on account of the failure of the latter to complete his performance: *Kauffman* v. *Raeder,* 108 Fed. 171, 177 (47 C. C. A. 278, 54 L. R. A. 247). In this aspect of the case, however, it was very apparent that the court was right, as the evidence showed to a demonstration, and there was nothing to contradict it; the defendant's chief witness, Mr. Williams, even admitting that the dredge was not transferred to plaintiff, but to the dredging company, and plaintiff received nothing from its operations.

4. Again, it is argued that there is another phase of the question inimical to plaintiff's rescission, which the defendant attempted to have placed before the jury by its eleventh instruction, whereby it was sought to have the court charge that, if they should find that defendant expended large sums of money in the maintenance of the dredge with plaintiff's assent or knowledge upon the faith of the contract, then that plaintiff could not rescind, and as a result could not recover in this action. There is confusion in this case by not holding in mind the respective theories upon which the parties base their action, but the learned trial judge has enunciated a clear conception of the issues. He says:

"If the contract actually was, and nothing more, that the defendant should sell a half interest in the boat to the plaintiff, and this matter of incorporating and issuing stock and carrying on the business was a mere afterthought, and no part of the original contract, not entering into the very integrity and life of the contract, inasmuch as it could not form a part of the consideration, * * you are not to give any attention to the plaintiff's view in that respect; but your verdict would be for the defendant if it was simply, as I say, a mere afterthought, or was simply a mere side issue."

Thus he put to the jury the whole of defendant's case, and it is manifest that the requested instruction had no place under that theory. Neither was it proper under plaintiff's theory, for no such expenditures could have been made, as it was one of the conditions that defendant might use the dredge for its own purposes at the cost of doing the work, and was to bear the expenses of the boat while idle, so that there could have been no outlay; the other condition being that defendant was to furnish a completed dredge for the sums advanced by plaintiff.

5. Requested instruction No. 25 is akin to No. 11, but as to that the trial court has very fully covered the subject-matter in the general charge. Requested instructions Nos. 19 and 20 were appropriate under defendant's theory of the case, but, as was the case with No. 25, the court has covered the entire subject-matter in the general charge; tersely, it is true, though not so full as it respects 25, but very aptly, and in language not to be mistaken. By the latter clause of No. 20 the court was asked to charge that, "If it [the plaintiff] failed to make any such bill of sale or transfer of its interest in said dredge to said Portland Dredging Co. then you must also find in this case a verdict for the defendant." In its general charge the court referred to the contention about the bill of sale, and stated that it did not regard the matter of any moment one way or the other. If plaintiff's theory was to prevail, the dredge passed into the hands of the dredging company from defendant, or else it remained with defendant, for plaintiff never received any transfer of title, and it was therefore not necessary that it should execute a bill of sale to the dredging company before plaintiff's right of action could accrue. If, on the other hand, defendant was to prevail, no bill of sale was then necessary, as plaintiff would be the absolute owner of one half of the dredge and the forming of the dredging company and the issuance of its stock would be a matter purely incidental, and a bill of sale by plaintiff to the dredging company could not affect the matter in any way. So that there was no error in the holding complained of. The other requested instructions refused need no special mention, being covered by the foregoing instructions.

6. There was objection to the admission in evidence of the memorandum dictated by Wheelwright in the presence of Williams, which the court overruled, and the defendant assigns error. The memorandum, under the conditions testified to by Wheelwright and corroborated by his stenographer, was admissible, if for no other purpose, as admissions of Williams, who was acting for and in behalf of the defendant as its manager: *Carstens* v. *McDonald,* 38 Neb. 858 (57 N. W. 757) ; *Hazer* v. *Streich,* 92 Wis. 505 (66 N. W. 720).

7. Another assignment of error relates to the court's permitting Wheelwright to explain what he meant by the use of the expression, "I bought half the dredge, as I stated." This was proper. The witness was still under examination, and if he gave out an erroneous impression of the facts as he understood them, he had a perfect right to make the correction in the presence of the jury. The same thing would be true if the erroneous impression were contained in a letter he had written relative to the subject, but the whole would be a matter for the jury's consideration as to the weight that should be attached to it.

The question put to the witness H. T. Groves, forming the basis of an assignment of error, was immaterial under the issues, and the one put to Williams, touching whether the dredge was delivered to the Portland Dredging Co. with the intention of carrying title, called for a deduction, which was for the jury.

Having considered all the questions presented by the transcript, and finding no error, the judgment of the circuit court will be affirmed, and it is so ordered.                    AFFIRMED.