Argued March 11, reargued June 17, affirmed July 1, argued on rehearing October 14, reversed and remanded on rehearing December 23, 1924.

## STATE *v.* SAMUEL DIRECTOR.

(227 Pac. 298; 231 Pac. 191.)

**Arson—Discrepancy Between Allegation and Proof Respecting First Initial of Name of Owner not Material Variance.**

1. Discrepancy between allegation and proof respecting first initial of name of owner of building burned does not constitute a material variance, under Section 1931, Or. L., in view of Section 1444.

**Arson—Allegation of Ownership Essential.**

2. Allegation of ownership in an indictment charging arson is part of description of offense, under Section 1931, Or. L.

**Arson—Ownership Need not be Proved With Same Degree of Fullness Required in Actions Involving Title or Right of Possession.**

3. In prosecution for arson under Section 1931, Or. L., ownership need not be proved with same degree of fullness required in actions involving title or right of possession to real property.

---

1.  See 14 R. C. L. 182.
2.  See 2 R. C. L. 511.
3.  Ownership of property burned as affecting crime of arson, see notes in 1 Ann. Cas. 621; Ann. Cas. 1912A, 1126.

**Arson—Averment of Ownership must be Proved as Laid.**

4. Averment of ownership of building burned must generally be proved as laid, under Section 1931, Or. L.

**Arson—Criminal Agency and Identification may be Established by Circumstantial Evidence.**

5. Both criminal agency in origin of fire and identification of accused as one who committed crime may be established by circumstantial evidence, under Section 1931, Or. L.

**Criminal Law—Guilt Held for Jury.**

6. Evidence introduced by state *held* sufficient to require defendant to enter upon his defense and introduce evidence, so direction to acquit would be evasion of province of jury, under Section 1931, Or. L.

**Criminal Law—Unsigned Statement of Assets Held Admissible.**

7. In prosecution for arson under Section 1931, Or. L., unsigned written statement purporting to show defendant's assets and liabilities presented by defendant to bank to induce loan was properly admitted in evidence, as against sole objection that it was not signed by defendant.

**Criminal Law—Objection to Evidence not Presented Below not Considered.**

8. Where ground of objection below was that hypothetical questions did not contain material incidents, and that witness had not shown himself qualified as an expert, defendant cannot complain for first time on appeal that witness was allowed to testify upon matters not subject of expert or opinion evidence.

**Criminal Law—Whether Fire Burned Naturally Matter for Expert Testimony.**

9. Whether fire was burning naturally and alone upon combustibles known to have been contained in the store was matter upon which expert testimony was admissible.

**Criminal Law—Error in Admitting Evidence Cured by Instruction Disregarded.**

10. Any error in admission of evidence was cured by instruction to jury to disregard.

### ON REHEARING.

**Criminal Law—Court's Instruction to Disregard Testimony Held Inapplicable to Portion Thereof.**

11. In arson prosecution, in which a fire inspector had testified that in going through defendant's place of business he had "found rubbish and accumulations several different times, and he had been notified to clean up," court's admonition to "disregard that," on motion by defendant's counsel to have jury instructed "to disregard

5. See 2 R. C. L. 514.
6. See 2 R. C. L. 514.
7. See 2 R. C. L. 513.
8. See 26 R. C. L. 1044.

that part of his testimony where he says he was notified several different times," did not exclude from consideration by jury testimony as to the rubbish and accumulations.

**Criminal Law—Objection to Question on Ground of Incompetency, Irrelevancy, and Immateriality Held Available to Raise Same Objections to Answer.**

12. Objection to question on ground of incompetency, irrelevancy and immateriality *held* available to raise same objections to answer, though after witness had started to testify, counsel objected that answer was not responsive, and court overruled objection.

**Criminal Law—Fire Inspector's Testimony as to Inspection of Defendant's Place of Business, Part of State's Case in Chief, Improperly Admitted in Rebuttal.**

13. In prosecution of store proprietor for setting fire to store, fire inspector's testimony that he had found rubbish and accumulations several different times on inspection of defendant's place of business, was part of state's case in chief, and was improperly admitted in rebuttal.

**Courts—Rules Read Together.**

14. Rules of Supreme Court will be read together.

**Criminal Law—Error of Law Apparent on Record Considered, Notwithstanding Absence of Assignment Complaining Thereof.**

15. Under Supreme Court Rule No. 12, and in view of Nos. 4 and 6, error of law apparent on face of record can be considered, notwithstanding absence of assignment of error complaining thereof.

**Criminal Law—Admission of Evidence Constituting Part of State's Case in Chief During Rebuttal Considered, Notwithstanding Absence of Assignment of Error.**

16. Admission of evidence constituting part of state's case in chief during rebuttal will be considered, under Supreme Court Rule No. 12, notwithstanding absence of assignment of error complaining thereof, where ruling thereon and exception thereto are shown explicitly in bill of exceptions, since in such case the ruling is apparent on the face of the record.

**Criminal Law—Admission of Testimony Constituting Part of State's Case in Chief During Rebuttal Held Reversible Error.**

17. In prosecution of store proprietor for setting fire to store, in which there was a conflict in the evidence as to whether the value of the stock exceeded the amount of the insurance, the admission, during rebuttal, of testimony of former employee of defendant, who had helped take inventory of stock, that stock was worth less than amount of insurance, *held* prejudicial error; such evidence being part of state's case in chief.

---

See (1) 16 C. J. 879 (1926 Anno.).   (2) 17 C. J. 60 (1926 Anno.). (3) 16 C. J. 869.   (4) 15 C. J. 911 (1926 Anno.).   (5, 6) 17 C. J. 181.   (7) 17 C. J. 306.

See 5 C. J. 563, 570, 572, 580, 582; 16 C. J. 742, 748, 930, 936; 17 C. J. 70, 326; 22 C. J. 305; 25 Cyc. 89.

17.   See 26 R. C. L. 1041.

From Clackamas: J. U. CAMPBELL, Judge.

In Banc.

[AFFIRMED.

For appellant there was a brief over the names of *Mr. Gilbert L. Hedges* and *Mr. Joseph E. Hedges,* with an oral argument by *Mr. Gilbert L. Hedges.*

For respondent there was a brief and oral argument by *Mr. L. Stipp,* District Attorney.

McCOURT, J.—This is a criminal action. Defendant, by the indictment, was charged with the crime of arson, committed as follows:

"The said defendant on the 24th of July, A. D. 1921, in the County of Clackamas and State of Oregon, then and there being, did then and there willfully, maliciously, unlawfully and feloniously set fire to a store building owned by Jacob Peters at Wilsonville, Oregon, by the burning whereof, the dwelling house of A. D. Aden was burned in the night time; said store building having been so set fire in the night time by defendant contrary to the statute, etc."

A trial resulted in a verdict of guilty and judgment of conviction. Defendant appeals.

At the close of the evidence introduced by the state in its case in chief, defendant interposed a motion to dismiss the action and discharge the defendant, and advanced as grounds for his motion: First, a fatal variance between the allegation in the indictment and the testimony adduced by the state as to the ownership of the dwelling, alleged in the indictment to have been burned by the defendant; and second, insufficiency of the evidence to justify the case going to the jury. Defendant assigns as

error the action of the court in overruling the above mentioned motion.

1. The indictment described A. D. Aden as the owner of the dwelling that was destroyed by the fire mentioned therein, while the proof showed that the dwelling referred to was owned by H. D. Aden, who, with his wife and two children, resided therein at the time of the fire. Defendant contends that the discrepancy between the allegation and proof respecting the first initial of the name of the owner constituted a material variance.

The indictment against the defendant charges an offense defined by Section 1931, Oregon Laws. That section reads as follows:

"§ 1931. Arson by Burning Dwelling in Night-time. If any person shall willfully and maliciously burn in the night-time any dwelling house of another, or shall in the night-time willfully and maliciously set fire to any building owned by himself or another, by the burning whereof any dwelling house of another shall be burned in the night-time, such person shall be deemed guilty of arson, and upon conviction thereof shall be punished by imprisonment in the penitentiary not less than ten nor more than twenty years."

The statute describes two offenses. The first arises where any person willfully and maliciously burns in the night-time the dwelling-house of another. The second is committed where any person willfully or maliciously sets fire to any building owned by himself or another, by the burning whereof any dwelling-house of another is burned in the night-time. In the one offense the criminal act involved is setting fire to the dwelling-house that is burned, and in the other, the criminal act consists of setting fire to a building owned by the accused or another. In either case, before the prohibited act constitutes the crime of

arson, a dwelling-house of another must be burned as a consequence of the particular act. Defendant is accused of the commission of an act constituting the second offense above mentioned.

2–4. The allegation of ownership in an indictment charging arson is part of the description of the offense (*State* v. *Moyer,* 76 Or. 396, 149 Pac. 84), and is essential in order to show that the property burned did not belong to defendant: Bishop's New Criminal Procedure, vol. 2, § 36; *State* v. *Chapin,* 74 Or. 346, 352 (144 Pac. 1187); *People* v. *Handley,* 100 Cal. 371 (34 Pac. 853). It need not be proved with the same degree of fullness required in actions involving title or right of possession to real property: 5 C. J. 582; *State* v. *Watson,* 47 Or. 543 (85 Pac. 336). But generally such an averment must be proved as laid. However, a variance between the allegation of ownership and the proof thereof, arising out of an erroneous allegation as to the person injured, may be made immaterial by statute, where the crime is described with sufficient certainty in other respects to identify the act charged to have been committed: 25 Cyc. 89, and cases cited in note 92; *State* v. *Adler,* 71 Or. 73 (142 Pac. 344); *State* v. *Chapin,* 74 Or. 351, 352 (144 Pac. 1187); *People* v. *Mills B. Sing,* 42 Cal. App. 385 (183 Pac. 865, 869); *People* v. *Hughes,* 29 Cal. 257.

Section 1444, Or. L., reads as follows:

"When a crime involves the commission of or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured or intended to be injured is not material."

Arson is a crime involving the commission of a private injury. The indictment identifies the act

that defendant is accused of committing by the following description:

" The said defendant on the 24th day of July, A. D. 1921, in the County of Clackamas and State of Oregon, then and there being, did then and there willfully, maliciously, unlawfully and feloniously set fire to a store building owned by Jacob Peters at Wilsonville, Oregon, * * said store building having been so set fire in the night time by defendant."

The foregoing description of the act charged to have been committed by the defendant identifies that act with all the particularity required in criminal pleadings.

The indictment supplemented the description of the overt act set forth therein by the charge that in consequence thereof the dwelling-house of A. D. Aden was burned in the night-time. The authorities above cited declare that the office of this latter averment is to show that the property burned did not belong to defendant. Manifestly, the indictment contains all the ingredients of the crime, and the overt act involved therein is specifically and completely identified, irrespective of the name of the owner of the dwelling-house that was burned by the fire which originated in the store building. In this situation, Section 1444 of Oregon Laws declares that an erroneous allegation as to the person injured is not material. It was conceded at the trial that as a consequence of the burning of the store building of Jacob Peters, the dwelling in question was burned in the night-time and the proof established beyond any question that the dwelling so burned did not belong to defendant. The latter was not misled in any way by the error appearing in the indictment in respect to the first initial of the owner's name. As said by the court in *State v. Chapin, supra:*

" * * there can be no question but that the crime
is described with sufficient certainty to identify the
act charged to have been committed, and the convic-
tion would be a complete bar to another prosecution
for the offense.   There was no fatal variance."

Shortly after 10 P. M. on the night of July 24, 1921,
fire was discovered inside of a one-story frame store
building occupied by defendant, and in which he
conducted a merchandise business at Wilsonville,
Oregon.   The building mentioned was 85 feet wide
and 100 feet in length, and the front thereof was
equipped with plate-glass windows.   The building
was owned by Jacob Peters, who for several years
prior to June 20, 1920, conducted a hardware store
therein.   On the date last mentioned, Peters sold what
then remained of his hardware stock and also a
quantity of paints and oils to defendant, for the
consideration of $7,500, and thereafter until the time
of the fire, defendant occupied the building as a
tenant, and carried on therein the business men-
tioned.

Defendant added to the stock of hardware, imple-
ments, paints and oils, which he purchased from
Peters, a quantity of workingmen's clothing, consist-
ing of overalls, gloves, socks, slickers, mackinaws,
rubbers and the like, also some furniture and a
small stock of groceries, the unsold portion of which
was in the building at the time of the fire.   A large
part of the goods embraced in the stock of merchan-
dise owned by defendant was kept in drawers and
upon shelves attached to the walls of the front part
of the building.   Lighter articles, such as clothing,
were placed upon the counters and in showcases;
while the heavier articles, such as stoves and furni-
ture, were placed upon the floor.   The oils which
defendant had in stock, including kerosene, were

113 Or.—6

stored in an oil-room, 20 by 38 or 40 feet, which had been provided for that purpose in the northeast corner at the rear end of the store building. In that room there was a 100-gallon kerosene tank, in which there was, immediately prior to the fire, 50 or 60 gallons of kerosene.

The state's witnesses estimated the value of defendant's stock of merchandise, at the time of the fire, at approximately $7,500, two thirds or more of which represented hardware and implements. He carried fire insurance upon that stock to the amount of $10,000. He was indebted to most of the wholesale houses from whom he had made purchases during the previous year, and had dishonored their claims for several months, upon the plea, in each instance, that he was unable to meet their demands.

Defendant resided with his family in Portland but had a bed in his store at Wilsonville, where he slept nights when he did not go home. On the night of the fire, and at the time the same was discovered, defendant was in the store. The kerosene lamp which defendant used for illumination had been extinguished for some time. There had not been any fire in the heating stove or elsewhere during the day or evening, from which fire might have been communicated to the building or the goods therein.

When the fire was first discovered, there appeared to be a small blaze in the center of the store about 30 feet from the front, but in less than five minutes, the fire had spread over the entire interior of the building, and the stock of merchandise kept therein, including the hardware, and caused the plate-glass windows in the front of the store to break and blow out. The flames emerging from the windows gave off a strong odor of coal-oil. In a very short time the fire came through the roof and wall upon the

north side of the building, and was communicated to
the dwelling-house of H. D. Aden, located a short
distance to the north, and wholly destroyed the same.
About the time the flames caused the front windows
to explode and break, defendant came from the rear
of the burning building, partly clad and shouted,
"Fire!" At that time defendant stated that he
was awakened by the smoke hurting his eyes; that
he got up and looked and saw the fire in the oil-room,
and that he grabbed his clothing and rushed out the
front door. The front portion of the building was
consumed first, and the fire appeared to be more
intense and to spread more rapidly there than in the
rear portion thereof. It spread over hardware and
like merchandise with the same rapidity as over
clothing and other inflammable articles. After the
fire, the kerosene tank in the oil-room was found to be
intact, but empty. It had not exploded, nor had its
seams separated.

Fred W. Roberts, a captain in the Portland Fire
Department, was called as a witness for the state,
and testified as an expert concerning the effect of
fire upon a kerosene tank of 100 gallons' capacity,
half filled with kerosene, and the action and spread
of fire in and upon a stock of merchandise such as
that owned by defendant, under the conditions and
circumstances shown by the state's evidence. Cap-
tain Roberts testified, in substance, that he had been
a member of the Portland Fire Department for 23
years, and had acted in the capacity of an investiga-
tor of fire causes for almost seven years; that he
attended about four fires a day; that all grocery
stores and places of that kind have a tank of kerosene;
that in the discharge of his duties, he had investigated
in the neighborhood of 100 such places in which fires
had occurred; that where a kerosene tank, partly

filled with kerosene, was upon a shelf or upon a solid foundation in a building that was completely destroyed by fire, ordinarily the seams of the tank would open and the oil would run out and burn; that quite often they extinguished fires in a building and find intact a partly filled tank of kerosene; that such a tank located in an inclosed room 50 feet from the fire would not affect the fire in any way; that ordinarily a fire would not in four minutes spread a distance of 30 feet in a store and over a stock of merchandise such as defendant had, and cause plate-glass windows to break; that the fire would be spreading very fast, if it spread that far in that time; that it could happen with any string of inflammable goods like "a bunch of celluloid or hangers—festoons"; that any row or line of inflammable oil or something of that nature would carry a fire like that, but without such inflammable material or oil, witness thought that a fire would not travel that fast.

Defendant contends that the evidence of the state above summarized fails to constitute any proof that the fire was caused by the willful act of some person criminally responsible, and also fails to connect defendant in any manner with the fire.

5. Both the criminal agency in the origin of the fire and the identification of the accused as the one who committed the crime charged may be established by circumstantial evidence: *First Nat. Bank.* v. *Fire Assn.,* 33 Or. 172 (50 Pac. 568, 53 Pac. 8); *State* v. *Rogoway,* 45 Or. 601 (78 Pac. 987, 81 Pac. 234, 12 Ann. Cas. 431); 5 C. J. 572.

6. We are clearly of the opinion that the evidence introduced by the state was sufficient to require the defendant to enter upon his defense and to introduce evidence. It was then the province of the jury to weigh the evidence and to pass upon the credibility

of the witnesses.   A direction to acquit in such a case would be an invasion of the province of the jury: *State* v. *Pomeroy,* 30 Or. 16, 24 (46 Pac. 797) ; *State* v. *Couper,* 32 Or. 212, 216 (49 Pac. 959); *State* v. *Williams,* 102 Or. 305, 307 (202 Pac. 428); *State* v. *Zullig,* 97 Or. 427, 439 (190 Pac. 580).

7. The next error assigned by defendant relates to an unsigned written statement which was introduced in evidence in connection with the testimony of D. L. Seeley, a witness for the state.  Defendant objected to the introduction of the writing in evidence, upon the sole ground that it was not signed by defendant.   D. L. Seeley was cashier of the bank at Wilsonville.  Defendant applied to him for a loan, and to induce Mr. Seeley to make the loan, presented to him the written statement in question, which purported to show defendant's assets and liabilities. Under those circumstances, the absence of defendant's signature did not render the writing inadmissible as evidence, if it was otherwise relevant or material: *Pacific Export Co.* v. *North Pac. Lbr. Co.,* 46 Or. 194, 205 (80 Pac. 105); 22 C. J. 305.

8, 9. At the trial defendant objected to the hypothetical questions propounded by the District Attorney to Captain Roberts, the substance of which testimony is above recited.  The ground of defendant's objection in each instance was that the question did not contain all the material incidents or elements established by the evidence and necessary to be taken into consideration in forming an accurate opinion. Defendant also objected that the witness had not shown himself to be qualified as an expert.

The questions suggested by the foregoing objections are not urged upon this appeal.  Here, defendant for the first time complains that the witness was allowed to testify upon matters which are not the

subject of expert or opinion evidence, thus presenting a widely different question from that raised by him in the trial court.

The question is not here for review, as the trial court was not requested to pass thereon. However, that precise question was settled by this court against the contention of defendant in the case of *First Nat. Bank* v. *Fire Assn.*, 33 Or. 172, 183 et seq. (50 Pac. 568, 53 Pac. 8). The condition and circumstances respecting the origin and progress of the fire in that case were strikingly similar to the corresponding facts in the instant case. The court, speaking through Mr. Justice WOLVERTON, said:

"All the elements would seem to concur in making the opinions of the witnesses above named, skilled as they were considered to be by the court below, competent to express an opinion touching the question whether the fire was burning naturally and alone upon the combustibles known to have been contained in the store. The jurors cannot be presumed to have known as much touching the characteristics of fires as those who have had much experience and training in extinguishing them, and who have had occasion to observe many of them, with a knowledge of the substance which gives them action. It was not a question of whether the fire was of an incendiary origin, respecting which the opinions of the witnesses were called, for that was the ultimate question, but whether the fire was burning naturally upon the known substance it had to feed upon, and we think such opinion evidence was competent."

10. At the request of counsel for defendant, the trial court instructed the jury to disregard the evidence referred to in defendant's fourth assignment of error. The direction to the jury was made promptly when and as requested, consequently the assignment presents no question for review by this court.

Finally, the defendant, by an exception to an instruction given to the jury by the trial court, again raised the question of a variance which was discussed earlier in this opinion and decided against defendant's contention.

No prejudicial error appearing in the record, the judgment of the Circuit Court is affirmed.

AFFIRMED.

McBRIDE, C. J., and BEAN, J., dissent.

---

Reversed and remanded on rehearing December 23, 1924.

ON REHEARING.

(231 Pac. 191.)

REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. Gilbert L. Hedges* and *Mr. Joseph E. Hedges,* with an oral argument by *Mr. Gilbert L. Hedges.*

For respondent there was a brief and oral argument by *Mr. L. Stipp,* District Attorney.

PIPES, J.—The judgment in this case was heretofore affirmed: *State* v. *Director, ante,* p. 74 (227 Pac. 298). Two members of the court dissented from that judgment and the court allowed a reargument, which has been had. The case is now before us for reconsideration.

The court in the former opinion decided five questions:

(1) That the variance between the initials of the man charged in the indictment to have been the owner

of the burned dwelling-house, and the initials of the man proved to have been the owner, was not a material variance. The indictment gave the name as "A. D. Aden," while the initials of the owner proved were H. D. Aden.

(2) That there was sufficient evidence "to require the defendant to enter upon his defense and to introduce evidence."

(3) That it was not error to admit in evidence a written statement by defendant showing defendant's assets and liabilities, over the sole objection that it was not signed by him.

(4) That the expert evidence of a fireman concerning the origin of the fire was properly admitted.

(5) The language of the court on this question is as follows:

"At the request of counsel for defendant, the trial court instructed the jury to disregard the evidence referred to in defendant's fourth assignment of error. The direction to the jury was made promptly when and as requested; consequently the assignment presents no question for review by this court." *State* v. *Director, ante,* p. 74, 227 Pac. 298, 301.

The fourth assignment of error, referred to in the above excerpt, is as follows:

"The court erred in allowing witness Arthur Pullen to testify as to the condition of defendant's store in Portland—a condition existing 15 or 16 months before the trial of this cause, as shown at pages 234, 235 of the printed testimony."

Except as to point 5, this opinion will not discuss the points decided in the former opinion.

A re-examination of the bill of exceptions discloses two rulings of the trial court that were reversible errors. One of them is the ruling referred to in the fourth assignment of error and in the excerpt of the

opinion above quoted. The other is the admission of the testimony of E. R. Hasselbrinck in rebuttal, which ruling will receive attention in its order.

To reach a full understanding of assignment No. 4, and of this court's ruling thereon, we will consider all of Mr. Pullen's testimony, the objections thereto, and the rulings of the trial court thereon. The record thereof in the bill of exceptions is in full as follows:

"Direct Examination.

"By Mr. Stipp:

"Q. What is your business? A. Assistant fire marshal—fire inspector for the city of Portland.

"Q. What did you say your particular business was in the department? A. Fire marshal, or inspector.

"Q. What do you do in connection with your duties as inspector? A. I go through practically all the business buildings in the city of Portland from Salmon Street to Couch Street, and from the River to 10th Street.

"Q. In connection with your duties were you ever in the place or store run by Mr. Director in Portland? A. Yes, sir.

"Q. When were you there last while he had it? A. Well, it was about fifteen or sixteen months ago, something like that.

"Q. Were you in there more than once? A. Yes, sir.

"Q. What attention did you give to his stock of goods when you were in there?

"Mr. Hedges: Objected to on the ground it is incompetent, irrelevant and immaterial, and not proper rebuttal testimony.

"Court: Objection overruled.

"Mr. Hedges: I save an exception.

"A. In making an inspection of all business places in the city of Portland it is our duty—

"Mr. Hedges: (Interrupting.) ·I object to that as not responsive to the question.

"Court: Objection overruled.

"Mr. Hedges: I save an exception.

"Court: An exception is allowed.   Go ahead.

"A. Our duty is to look for fire menaces, waste material, rubbish, or accumulations that will start fire of any description, and in going through his place of business I have found rubbish and accumulations several different times, and he has been notified to clean up.

"Mr. Hedges: We move to strike that out and have the jury instructed to disregard that part of his testimony where he says he was notified several different times.

"Court: The jury will disregard that.

"Q. How about the stock of goods? A. Well, it was like most little stores along Front Street; it was a cheap class of goods.   It was not first-class goods, even in the second class.   It was way down below par, I would say.   Men that wanted good substantial clothing would not buy that.

"Q. You haven't any idea, I don't presume, as to the value of the stock? A. No, sir; only I would class it as very cheap.

"Cross-examination.

"By Mr. Goldstein:

"Q. Have you the date you were over to that place of business formerly conducted by Mr. Director? A. No, sir; I haven't it with me.

"Q. You say it was about fifteen or sixteen months ago? A. As near as I can remember, yes.

"Q. How did you fix that in your memory as being fifteen or sixteen months ago? A. Well, we used to go through these places of business every two months, and now it is every three months.

"Q. Did you go to Wilsonville? A. No, sir.

"Q. You have never been at Wilsonville? A. No, sir.

"Q. Have you been over at Front Street? A. First Street.

"Q. First Street? A. Yes, sir.

"Q. You happened to look through and see what class of merchandise? A. We look through everything when we go into a place of business. We take in everything, every opening.

"Q. He had clothing? A. Yes, sir.

"Q. You are sure? A. Well, I couldn't class it clothing myself, because I generally buy good clothing.

"Q. What do you call good clothing? A. (Indicates own clothes.)

"Q. A suit like you have on? A. Yes, sir.

"Q. He didn't have that class of shirt? A. No, sir; I don't think so.

"Q. You are sure he had men's suits, consisting of a coat, pants and vest? A. I could not say what he had.

"Q. When you say clothing, what do you mean? A. Anything consists of clothing that you wear. Socks are a part of your clothing. Pants are a part of your clothing.

"Q. That is what you call it? A. Yes, sir.

"Q. Did you see any suits of clothes that people wear, consisting of a coat, trousers and vest? A. Really, I could not answer that, because I didn't look into details for that.

"Q. You were there for the purpose of looking? A. Yes, sir.

"Q. But you can't say now whether he had men's clothing? A. Yes, I can say he had men's clothing. Yes, but what kind, only just noticing practically like in all those stores you can go and see on First Street.

"Q. I am asking you what you saw there. That is what I am interested in. Tell us what you saw there. A. Well, he had a general line of clothing.

"Q. A general line of clothing? A. Yes, sir.

"Q. What else did he have? A. He had rubber boots, and coats, and one thing or another—slicker coats, and particularly some shoes, quite a number of shoes on each side.

"Q. Was there anything wrong with the shoes? A. Only a common class of shoes.

"Q. What price were they? A. On an average of from $2.50 up to $5 or $6.

"Q. At the wholesale prices? A. Sale prices, I imagine.

"Q. You imagine that? A. Yes, sir.

"Q. What was the name of the $2.50 shoes? What quality, and what was the name of it?

"Court: Don't waste time.

"Q. What other things did you find? A. I found quite a bit or rubbish in the back, for one thing.

"Q. Was it packed with rubbish? A. Yes, sir; loose papers and other waste.

"Q. How much of it, approximately? A. Quite a bit.

"Q. You were only in there once? A. I was in there several times.

"Q. How many times were you there? A. Well, now, that is hard for me to say that.

"Q. Were you there more than twice? A. Yes, sir.

"Q. Looking through the entire place? A. Yes, sir; from top to bottom.

"Q. And looked through the quality of merchandise he had? A. Oh, no, sir; we don't do that. You know better than that.

"Mr. Stipp: Did you see any secondhand stuff? A. Well, I would say maybe some of it that hung in the rear; it looked like secondhand stuff.

"Q. You say you think there was some secondhand stuff? A. I would think so.

"Q. Would you say you saw secondhand merchandise in the store conducted by Samuel Director? A. No, sir; I would not say positively."

11. It appears from this record that the trial court did not instruct the jury to disregard the testimony of the witness concerning the "condition of defendant's store in Portland—a condition existing 15 or 16 months before the trial of this cause, as shown at pages 234, 235 of the printed testimony," as specifically recited in the assignment. The instruction to the jury to "disregard that" was in response to a specific objection, not to all of the witness' answer,

but to a particular and specific part of it. The language of the objection was to disregard "that part of his testimony where he says he was notified several different times." It was "that" that was taken from the jury. The rest of the answer remained with the jury, and it was couched in these words:

"Our duty is to look for fire menaces, waste material, rubbish, or accumulations that will start fire of any description, and in going through his place of business *I have found rubbish and accumulations several different times.* * * "

It seems too plain for controversy that the jury must have understood that the only part of Pullen's testimony that they were to disregard was that to which the specific objection was made, and that the ruling of the court made at the instant was a ruling on that objection, and no other.

It will be noticed that the assignment predicates no error upon the part of the witness' answer that was taken from the jury. That assignment goes to the competency and relevancy of the evidence concerning the condition of the store at Portland fifteen or sixteen months before. But this evidence also went in over the objection of the defendant. The question that elicited the answer of the witness was:

"What attention did you give to his stock of goods when you were in there?"

The objection was:

"Objected to on the ground it is incompetent, irrelevant, and immaterial, and not proper rebuttal testimony."

The objection being overruled, an exception was taken. When the witness was proceeding to answer: "In making an inspection of all business places in

the city it is our duty—'' the defendant objected that the answer was not responsive to the question, but the court held that it was, over objection and exception.

12. Under such circumstances, the objection to the question on the ground of incompetency, irrelevancy and immateriality, is available to raise the same objections to the answer when given.

We misconceived, in our former opinion, the scope of this objection, the ruling thereon, and what of Pullen's testimony was taken from the jury. The consequence of that is that this court has not yet passed upon the admissibility of the evidence concerning the condition of the store at Portland.

One ground of the objection was that it was irrelevant. The argument is not without force that the fact that the defendant allowed debris and accumulations that would start fire in his store at Portland sixteen months before had no tendency to prove that he willfully and maliciously set fire to his store at Wilsonville. The inquiry might still be serious whether the jury would not feel authorized to draw the natural conclusion from the evidence that the defendant was careless in suffering debris and accumulations about the premises, and so to conclude that the carelessness constituted the arson charged.

13. However that may be, and not deciding these questions, there was another objection to the evidence that admits of no doubt and should have been sustained. It was that it was not proper in rebuttal. If the evidence had any tendency to prove the charge against the defendant, it was a part of the state's case in chief. This court is thoroughly committed to the rule that in a criminal case it is reversible error for the court to admit evidence in rebuttal which was a part of the state's case in chief, without

reopening the case or good reason shown for separating the case into parts. The first case in which this point was decided is *State* v. *Hunsacker*, 16 Or. 497 (19 Pac. 605). The charge there was larceny of a horse, and the identification of the horse was sought to be proved by the brand. The court said:

"Another error which would also require a reversal was committed by the introduction of the testimony of Joseph Putman, claimed by the district attorney to be in rebuttal. Numerous witnesses, both for the state and the defendant, were called, who described minutely and with particularity the brand on the animal in question, and then after the defendant had rested Joseph Putman was called by the state. The record recites *in rebuttal,* and he was asked a number of questions as to the appearance of the brands on the horse in dispute by the district attorney, over the objection of the defendant. I think this was improper. The state was bound to exhaust its evidence in chief before the defendant's witnesses could be heard.

"After the defendant had closed his evidence the state could not re-open the case and give additional evidence to support its case without special leave of the court, obtained for that purpose, which was not done. This evidence was in no sense rebuttal. It was cumulative evidence, tending to support the state's contention, and ought to have been introduced in chief, and before the state rested. (Hill's Code, § 196, subds. 2, 3.)" 16 Or. 497, 499 (19 Pac. 605, 607).

That case was cited and the rule announced with still greater emphasis in *State* v. *Minnick*, 54 Or. 86, 94 (102 Pac. 605, 608). The charge there was larceny of two heifers. The evidence complained of was admitted in rebuttal. The rule was thus announced:

"T. B. Johnson was called in rebuttal by the state and, as an expert, testified, generally, as to the apparent age of the calves, their actions, indicating that

they had been raised on skim milk, and other circumstances which tended to support the theory of the prosecution in the case. The evidence given by him was in no sense rebuttal, but was a part of the state's case in chief, and, under such circumstances, it was error to admit it. [Citing *State* v. *Hunsaker, supra.*] We do not hold that the state may not, in a proper case and by leave of the court, obtained for that purpose, reopen its case and introduce evidence in chief, even after defendant has rested his case; but this was not done in the case at bar. The record shows that the testimony was offered simply in rebuttal. No reason was given, or showing made, to explain why it was not offered as part of the prosecutor's case in chief. While in a civil case we would not feel inclined to interfere with the discretion of the court in the order of proof, unless there appeared a clear abuse of such discretion, we think a more strict rule should be invoked in a case where the liberty of a citizen is involved, and that this is not a case that comes under the principle announced by this court in *Crosby* v. *Portland Ry. Co.,* 53 Or. 496 (101 Pac. 204)."

Both of the above cases were cited and followed in *State* v. *Evans,* 98 Or. 214 (192 Pac. 1062, 193 Pac. 927), where, if ever, the question must be held to have been set at rest. The charge was assault and robbery, being armed with a dangerous weapon. The state's case depended upon whether the prosecuting witness could identify the defendant as the person who assaulted him. Evidence was offered and received in chief, but without defendant's objection, that the prosecuting witness had identified the defendant in jail at Klamath Falls, and giving in detail the conversation there held. The defendant then testified that he protested his innocence at that interview, and that he had never seen the prosecuting witness before. The sheriff was then called, in pretended rebuttal, who testified over objection that it was not

proper rebuttal, that the prosecuting witness had identified the defendant at Klamath Falls as the man who robbed him. Concerning this evidence, the court said:

" * * It ought not to have been admitted in the first place, although no objection was made to it. It was clearly not rebuttal, and it had the effect of giving the state the last chance to testify in support of its case. In *State* v. *Hunsaker,* 16 Or. 497 (19 Pac. 605), it was held that in a criminal case the state cannot be permitted to withhold a part of its evidence in chief and then introduce it in rebuttal after the defendant has rested his case. Like doctrine is laid down in *State* v. *Minnick,* 54 Or. 86 (102 Pac. 605). In the instant case there was no request for the court to re-open the case, as in *State* v. *Merlo,* 92 Or. 678 (173 Pac. 317, 182 Pac. 153). In prescribing the order of proceedings on trial, Section 132, L. O. L., indeed says that after the plaintiff has introduced evidence on his part and has concluded, and the defendant has done the same, 'the parties may then respectively introduce rebutting evidence only, unless the court, for good reasons and in furtherance of justice, permit them to introduce evidence upon the original cause of action, defense or counterclaim.' Some good reason should appear for separating the state's case into parts and giving a portion in chief and another in rebuttal. Permission should not be granted arbitrarily out of hand. The objection should have been sustained on the ground that the testimony was not rebuttal. The evidence as to identification at Klamath Falls should have been rejected." 98 Or. 214, 234 (192 Pac. 1062, 1068).

As the court below did not take that evidence from the jury, it was suffered to remain in the case for their consideration, as rebuttal testimony, which, under the three cases quoted, was error.

The other error which we hold is reversible was committed when the court admitted in rebuttal the

113 Or.—7

testimony of E. R. Hasselbrinck, over the specific objection that it was not proper rebuttal testimony. For the better understanding of the point we quote the direct testimony of that witness in full:

"By Mr. Stipp:

"Q. Where do you live? A. Wilsonville, Oregon.

"Q. Are you acquainted with Mr. Director? A. Yes, sir.

"Q. Have you worked in the store out there for him after he took it over? A. I did.

"Q. What work did you do in that connection along about the 1st of January, 1921? A. Well, I was working in the store, waiting on the people, and I helped him inventory that time, and general work.

"Q. Did you assist in taking an inventory at that time? A. Yes, sir.

"Q. Who took the inventory? A. Well, the boy and I worked together. His boy Harry and I worked together. I read them off, and took them out of the shelves, and he put them down.

"Q. How much did the stock in that store inventory at that time? A. Well, I never knew the facts on it. I never knew the figures on it.

"Q. Did you ever inquire? A. Yes, sir; I asked the boy.

"Q. What did he say?

"Mr. Goldstein: Whom did you ask?

"A. Harry Director.

"Mr. Goldstein: I object to that as being incompetent, irrelevant and immaterial.

"Court: Harry was bookkeeper.

"Mr. Goldstein: Unless defendant was present. Any statement someone else would make would not bind this defendant.

"Court: Objection overruled.

"Q. What did Harry say? A. Well, I asked him two or three times and he would not answer me. He said no one would ever know how much stock they had.

"Q. He told you no one would ever know? A. Yes.

"Q. How long had you worked in that store?   A. Do you mean for Director?

"Q. Yes, and for Mr. Peters, before Mr. Director took it.   A. I went to work for Mr. Peters in 1915, and worked there right along every day.

"Q. And Mr. Director, how long did you work for him?   A. Do you mean altogether?

"Q. Up to the time you quit?   A. I went to work for Director on July 6th, and worked right along.

"Q. How familiar were you with the stock that was in there at the time that Mr. Peters disposed of it to Mr. Director?   A. Well, I had been there every day, and knew what there was, six years.

"Q. Do you know what the value of the stock was, the hardware stock and the portion or part of the stock that Mr. Peters sold to Mr. Director?

"Mr. Hedges: That is objected to as being incompetent, irrelevant and immaterial; and not proper rebuttal testimony.

"Court: Objection overruled.

"Mr. Hedges: I save an exception.

"(Reporter reads the question.)

"A. I don't know the exact value of it.   There was no inventory taken.

"Q. Can you, from your knowledge, put an estimate on the value of the stock?   A. The entire hardware?

"Q. Hardware, furniture, paint, and so on?

"Mr. Hedges: The same objection, incompetent, irrelevant and immaterial, and not proper rebuttal.

"Court: The same ruling.

"A. Well, I should guess between seven and eight thousand dollars worth of stock there at that time.

"Q. What time?   A. When Director took the stock over.   Is that what you mean?

"Q. Yes.   A. Between seven and eight thousand dollars at that time.

"Q. How much was there there on January 1st, 1921, when he took the inventory of that same portion of the stock?   A. An estimate of it, do you mean?

"Q. Yes.   A. Well, between five and six thousand dollars, I think.

"Q. Of that? A. Yes, sir.

"Q. And what paint, how much? A. Well, about $250.00 worth of paint stock at that time.

"Q. Did you see the dry-goods stock? A. Yes, sir.

"Q. How much was there of that? How much was that worth at that time? A. January 1st?

"Q. Yes. A. Well, between ten and twelve hundred dollars, I guess, January 1st. I should judge that.

"Q. And the grocery stock? A. About four hundred dollars, I guess.

"Q. And what was the character of the quilts and blankets? A. Well, they were mostly cotton shoddy. The quilts were marked 'Cotton shoddy' right on them.

"Q. Do you know whether that stock was reduced any between the 1st of January and the 24th of May, when the fire occurred? A. Well, he had been selling out right along, at the time I left there anyway.

"Q. What can you say as to how much it had been reduced? A. Between January and May?

"Q. Yes. A. Well, I should say about a thousand dollars, or something like that.

"Q. The hardware line, or all of it together? A. Well, the hardware alone. About a thousand dollars."

Under the cases cited this was error. But it must be said that there is no assignment of this error in the brief. It must be first determined whether we are permitted in such case to notice the error. That will depend upon the rule of this court governing such cases. Rule 12 (100 Or. 749), is as follows:

"On the hearing in this court, no questions will be examined or considered at the instance of the appellant, except those going to the jurisdiction of the court, or when the pleading does not state facts sufficient to constitute a cause of action or defense, or those arising upon the assignments of error as contained in the printed abstract. The court reserves the right in furtherance of justice to notice on its

own initiative a plain error of law apparent on the face of the record.''

Rule 6 (100 Or. 744), provides that in criminal cases a printed abstract may be served and filed or not, as the appellant may elect. And Rule 4 (100 Or. 743), provides that in criminal cases the appellant shall set out in full in his first brief the errors alleged.

14, 15. Rules 12, 4 and 6 will be read together, so that the reservation contained in the last sentence of Rule 12 will qualify Rule 4 to the same extent as it qualifies the first provision of Rule 12. This court has applied the first sentence of Rule 12 in innumerable civil cases, and has consistently refused to notice errors not assigned. We do not intend here to relax that rule, where it is applicable. But the last sentence of Rule 12 is as much a part of the rule as the parts that have been so often enforced in civil cases. When the conditions required in this rule exist, the court falls under the coercion of a rule it has itself made to further justice.

16. The ruling made here and the exception to it are shown explicitly in the bill of exceptions. The ruling is apparent on the face of the record, and it is just as apparent that it was error. Our cases referred to take this error out of the domain of argument.

17. It will have been noticed that the language of this court concerning testimony in chief allowed in rebuttal is not confined to a construction of the strict letter of the statute. The holdings all are to the effect that the method denounced is essentially unfair. But the record here emphasizes the unfairness in this case. A great part of the testimony on both sides was directed to the question of motive. The value of the property destroyed compared with the insurance on it was a very important issue on the

question of motive.  The circumstances surrounding the fire in this case greatly needed the help of an adequate motive to sustain the conclusion that the defendant set the fire.  The state, recognizing this, called in chief some five or six witnesses, with more or less opportunity of knowledge, whose testimony had a tendency to prove that the stock of goods was worth much less than the insurance and that the defendant was financially embarrassed.  The defendant produced more than an equal number of witnesses, including himself, whose testimony tended to show that the stock was worth as much as, or more than, the insurance carried.  Then, without reopening the case, or showing any excuse for not calling the witness in chief, the state offered E. R. Hasselbrinck as a witness.  He had worked for defendant for some time in the store and had helped take an inventory of the stock, although he did not know the figures. He had worked for the former owner and then right along for defendant.  He testified that the stock was worth something over $8,000, which was reduced by $1,000 between January and the night of the fire; the value given by him being something over half the insurance, which was $10,000.  This witness had perhaps the best opportunity to estimate the value of the stock of any witness for the state.  The case not being reopened, the defendant had no opportunity to meet this evidence.  After the warm contest on the question of the value of the stock, to throw this evidence against the defendant under guise of rebuttal testimony might well have turned a wavering doubt in the minds of the jurors of the existence of a motive, and therefore of the commission of the crime by defendant, into a moral certainty of his guilt. Without the motive of gain, it would be inexplicable that the defendant would burn his store.  Letting

this evidence in, under the circumstances, was not only clear error, but it was highly prejudicial. The case is within the reason of our Rule 12. We have reserved the right to notice this error on our own initiative, without an assignment, and in furtherance of justice. The error so noticed, being plain and apparent on the face of the record, and leading possibly to an unjust conviction, is ground for reversal.

The very reason of this rule is to leave the court free, in the case of error, beyond debate, to do justice, where for any reason the assignment is omitted.

The judgment appealed from is reversed and a new trial ordered.    REVERSED AND REMANDED.