Argued September 15, affirmed November 16, petition for
rehearing denied December 14, 1955

## STATE *v.* MOLITOR ET UX

289 P. 2d 1090

*Wallace Johansen* argued the cause for appellants. On the brief were McKeown, Newhouse and Johansen, of Coos Bay.

*Courtney R. Johns,* District Attorney, of Albany, argued the cause and filed a brief for respondent.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, BRAND and LATOURETTE, Justices.

TOOZE, J.

The defendants, Kermit A. Molitor and Neva L. Molitor, appeal from a judgment of conviction for the crime of arson in the first degree. They each were sentenced to imprisonment in the Oregon State Penitentiary for an indeterminate time, the maximum of which was fixed at three years.

The indictment charging defendants with the crime of arson in the first degree was returned by the grand jury of Linn county, Oregon, on June 10, 1953, and, omitting formal parts, it reads as follows:

"The above named defendants are accused by the Grand Jury of the County of Linn, by this indictment, of the crime of Arson in the First Degree committed as follows:

"The said Kermit A. Molitor and Neva L. Molitor on the 15th day of May A.D. 1953, in the County of Linn, State of Oregon, then and there being and then and there acting together and each aiding and abetting the other, did then and there unlawfully, wilfully, maliciously and feloniously, cause to be burned a certain dwelling house, located at 532 Eleventh Street, Sweet Home, in the county and state aforesaid, contrary to the statutes in such

cases made and provided, and against the peace and dignity of the State of Oregon.''

Defendants demurred to the indictment on the following grounds:

"I.

"Demur to the indictment on the ground and for the reason that it appears from the face thereof that the said indictment does not substantially conform to the requirements of Chapter 7 of Title 26 of the Penal Code of the State of Oregon, for the following reasons:

"(Section 26-832 1940 O.C.L.A.)

"1) That the indictment does not set forth the act or omissions charged as the crime, clearly and distinctly in ordinary and concise language and in such a manner as to enable a person of common understanding to know what is intended.

"(Section 26-706 and Section 26-714 1940 O.C.L.A.)

"2) That the indictment is not direct and certain as regards the crime charged and the particular circumstances of the crime charged, the particular circumstances being necessary to constitute a complete crime, and does not contain a specification of the acts and descriptive circumstances as will enable the Defendants to prepare a defense thereto.

"(Section 26-706 1940 O.C.L.A.)

"3) That the indictment is insufficient to inform the Defendants of the nature and cause of the accusation against them.

"(Article I, Section 11, Constitution of the State of Oregon)

"II.

"Demur to the indictment on file herein on the ground and for the reason that the facts stated do not constitute a crime.''

The demurrer was overruled.

As their first assignment of error on this appeal, defendants attack the sufficiency of the indictment upon the same grounds set forth in their demurrer, contending that it was error for the trial court to overrule it.

Section 1 of ch 473, Oregon Laws 1947 (ORS 164.020), provides:

"Any person who wilfully and maliciously or wantonly sets fire to or burns or causes to be burned, or who aids, counsels or procures the burning of the following designated property:

"(a) Any dwelling house, as defined in this act, or

"(b) Any building that is a part of any dwelling house, as defined in this act, or belonging to, adjoining or adjacent thereto, the burning of which would imperil such dwelling house, whether either such dwelling house or building is the property of himself or another, or

"(c) Any public building, as defined by section 99-2701, O.C.L.A., in which there is at the time any human being, shall be deemed guilty of arson in the first degree, and upon conviction thereof, shall be punished by imprisonment in the penitentiary not less than two years nor more than twenty years."

Section 26-703, OCLA (ORS 132.520), provides:

"The indictment must contain:

"(1) The title of the action, specifying the name of the court to which the indictment is presented, and the names of the parties;

"(2) A statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

Section 26-706, OCLA (ORS 132.530), provides:

"The indictment must be direct and certain, as it regards:

"(1) The party charged;

"(2) The crime charged; and,

"(3) The particular circumstances of the crime charged when they are necessary to constitute a complete crime."

Section 26-714, OCLA (ORS 132.540), provides:

"The indictment is sufficient if it can be understood therefrom:

"(1) That it is entitled in a court having authority to receive it, though the name of the court be not accurately stated;

"(2) That it was found by a grand jury of the county in which the court was held;

"(3) That the defendant is named, or if his name can not be discovered, that he is described by a fictitious name, with the statement that his real name is to the jury unknown;

"(4) That the crime was committed within the jurisdiction of the court, except where, as provided by law, the act, though done without the county in which the court is held, is triable therein;

"(5) That the crime was committed at some time prior to the finding of the indictment, and within the time limited by law for the commencement of an action therefor;

"(6) That the act or omission charged as the crime is clearly and distinctly set forth, in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended;

"(7) That the act or omission charged as the crime is stated with such a degree of certainty as to enable the court to pronounce judgment, upon a conviction, according to the right of the case."

■ A comparison of the words used in the indictment with the language employed in the statute to define the crime of arson in the first degree clearly discloses that the indictment charged the crime against defendants in the language of the statute. It has become hornbook law in this state that in an indictment for an offense created by statute, it is usually sufficient to describe the crime in the words of the statute. Sometimes, however, a statement of the particular circumstances of the crime is necessary in order to charge a defendant with having committed specific acts bringing him within the condemnation of the statute, and in such cases the indictment must be direct and certain as to those circumstances. Charging one with unlawfully setting up and conducting a lottery is an example of the type of case requiring a statement in the indictment of the particular circumstances of the crime. *State v. Dougherty*, 4 Or 200. This is because the term "lottery", as used in the statute, is a generic term. It embraces many and different schemes of gaming involving consideration, chance, and prize. Therefore, one charged with conducting a lottery, is entitled to be advised in the indictment as to the particular circumstances of the scheme claimed to be unlawful, but in the instant case, charging the crime in the language of the statute was sufficient. The indictment clearly advised defendants of the time and place when and where it is claimed they wilfully and maliciously caused to be burned a certain dwelling house, and described its location. Every essential element of the statutory crime is set forth in the indictment. The state was not required to plead the evidence upon which it relied for a conviction of defendants, nor any part thereof.

■ Prior to 1947, the statutory crime of arson for

burning a dwelling house was defined substantially as it was defined at common law. § 23-501, OCLA. It consisted of the wilful and malicious burning of the dwelling house *of another in the nighttime.* However, the new law of 1947, which repeals § 23-501, OCLA, defines a new crime; viz., the wilful and malicious burning of *a dwelling house,* without regard to whether the dwelling house belongs to another, or whether the act is committed in the nighttime or daytime.

Prior to the enactment of the 1947 law, the legislature had approved the following form for charging the crime of arson under § 23-501, OCLA:

"Wilfully and maliciously set fire to (or burned) in the nighttime, a dwelling house of another, namely C D (or whose name is unknown to the grand jury)."

This approved form of pleading was in the words of the statute, just as the indictment in the instant case is in the words of the statute. No more should be required under the new law than was required under § 23-501, OCLA. The assignment of error is without merit. *State v. Smith,* 182 Or 497, 502, 188 P2d 998; *State v. Pearlman,* 154 Or 52, 54, 58 P2d 1253; *State v. Dormitzer,* 123 Or 165, 169, 261 P 426; *State v. Runyon,* 62 Or 246, 250, 124 P 259.

■ Defendants' assignments of error numbered two to seven, inclusive, present the same legal question. Upon the conclusion of the state's case in chief, defendants made separate motions for a dismissal of the prosecution as to each of them. The motions were denied. Again, upon the conclusion of the trial, each defendant moved for a directed verdict of "not guilty", those motions also being denied. Each defendant then requested in writing that the court in-

struct the jury to return a verdict of not guilty as to each of them. The requests were denied. The jury returned a separate verdict of guilty as to each defendant. The question presented by the several motions and requests is whether there is sufficient substantial evidence in the record to support a conviction of either or both defendants. The evidence upon which the state relies is largely circumstantial.

The defendants are husband and wife. They formerly resided at Grants Pass, in Josephine county, Oregon. In August, 1952, at the agreed price of $9,000, they purchased from one Robert W. West and wife the dwelling house and tract of land (containing approximately one-half acre) located at 532 Eleventh street, in Sweet Home, Linn county, Oregon, and immediately went into possession and occupancy thereof. The agreed purchase price was to be paid as follows: $400 in cash; a promissory note in the sum of $2,847.50, payable in instalments of $400 not later than October 11, 1952, and $2,447.50 not later than November 26, 1952, to be secured by a second mortgage lien upon the premises, in favor of Robert W. West and wife; by assuming and agreeing to pay a promissory note in a sum in excess of $5,000, secured by a first mortgage lien upon the property, in favor of a Mrs. Kruse. Defendants made the cash payment of $400 and executed and delivered the note and mortgage in favor of the Wests. Up to the time of the fire hereafter discussed, they had made four or five monthly payments of $40 each upon the Kruse note, but had made no payments whatever upon the note given to the Wests, except the sum of $400 due October 11.

At the time defendants purchased the premises, the dwelling house was covered by insurance in the sum of $6,000, the policy expiring in 1954. Defendants

also carried insurance upon their household belongings in the sum of $3,500, the policy expiring early in 1953. The policy covering the dwelling was transferred to defendants when the purchase was made. In March, 1953, defendants procured a policy of insurance from the American Insurance Company in the sum of $6,500 (term for three years commenced March 17, 1953), covering their household furniture and personal property at 532 Eleventh street in Sweet Home. On April 15, 1953, defendants also procured a policy of insurance from the same insurance company in the sum of $10,500 (term for three years commenced April 13, 1953), covering the dwelling house. This additional insurance gave them a total coverage upon the dwelling house of $16,500.

At the time this additional insurance upon the dwelling house was taken out, defendants had made no improvements to the building other than some painting and wallpapering which they had done themselves.

The dwelling house faced east. It consisted of five rooms: (1) living room (18 ft. 2 in. by 19 ft. 2 in. in size); (2) front bedroom on north side with entrance from living room (15 ft. 8 in. by 12 ft. 2 in. in size); (3) dining room on south side with large entrance from living room (15 ft. 2 in. by 11 ft. 2 in. in size); (4) kitchen on south side with entrance from dining room (11 ft. 2 in. by 10 ft. in size); (5) back bedroom on north side with entrance from dining room (12 ft. by 15 ft. in size). On the east side of the back bedroom with entrance therefrom is the bathroom, 12 ft. by 6 ft. in size. Adjoining the kitchen on the west and with an entrance from the kitchen is a storeroom, 25 ft. by 9 ft. in size. On the south side of the storeroom is the garage, approximately 26 ft. 5 in. by 12 ft. in size.

In the northwest corner of the garage is a closet, 5 ft. 4 in. by 6 ft. 9 in. in size, with an entrance from the storeroom. In the west end of the rear bedroom is a closet, 3 ft. 6 in. in width and approximately 10 ft. long, with an entrance from the bedroom. In entering the living room from the front, one passes through two doors, the first leading to a front porch, and the second, into the living room. There is an outside door in the northeast corner of the rear bedroom; there also is an outside door on the north side of the storeroom, one on the east side next to the garage, and one into the garage at its southeast corner; the outside door to the garage on the east side thereof is a large door. A graveled driveway leads from the garage east to Eleventh street. The house is well supplied with windows of varying sizes.

Heat for the house was provided by an oil burning stove which contained two burner pots. This stove was located in the northwest corner of the dining room.

The immediate family of defendants consisted of themselves and two minor sons, one aged 10 years, and the other aged 3 years. They also had the custody of two girls, Wanda Perky and Sally Malena. At the time of the fire hereafter mentioned, Wanda had been in their custody for five or six years, as the ward of the Coos county court; Sally Malena had been in their custody for approximately nine months, as the ward of the Josephine county court. They received regular pay for the care of these two wards. The defendants occupied the front bedroom, and the children, the rear bedroom in the home. Sally Malena was fifteen years of age.

At about 2 o'clock a. m. on Saturday, May 16, 1953, fire broke out in defendants' home. The fire department arrived at the scene of the fire at about 2:05

a. m. They found the center of the fire located in the rear bedroom and closet. All doors to the house were locked, and there was no one present in the home. The outside rear bedroom door was broken open, as well as the window of the bedroom, and water was played upon the fire through those two openings. Considerable difficulty was experienced in extinguishing the flames. One fireman testified as to the fire as follows:

"Well, just that it was awful hot. It burned awful hot and it would keep flaring up. We would get it down and then it would seem like we would have just as much fire all over again."

The base of the fire seemed to be in the closet of the rear bedroom, and it was finally necessary to cut through the rear wall of the closet in order to get water directly on the fire raging therein. The atmosphere was pervaded with a strong odor of fuel oil and gasoline. The direct damage from fire was confined to the rear bedroom and closet and the bathroom, although the remainder of the house sustained smoke damage.

When the fire was finally extinguished, an investigation was made by the firemen and police officers. This investigation revealed the following: In the closet off the rear bedroom was a lot of debris, including the remains of wood shavings. This debris was raked into the bedroom and in it was found a small candle holder. The candle holder had a red plastic base, much of which had been burned; and the remaining portion was considerably warped. The metal cup for holding the candle was about 1¼ inches in diameter and 1½ inches deep. The remains of the wood shavings were analyzed and found to contain fuel oil and gasoline. All the debris smelled strongly of fuel oil and gasoline. In the left burner pot of the oil burner were found

two jars of gasoline, one a quart jar with the cap on, the other a pint jar without cap, the pint jar sitting on top of the quart jar. A quart jar containing a small amount of fuel oil was found in a kitchen cupboard, and fuel oil was spread over the top of the snack bar in the kitchen. Two candles were found in a drawer in the kitchen, one white, the other red. The red candle is approximately eight inches long and $1\frac{1}{4}$ inches in diameter. The evidence was practically conclusive that the fire was of incendiary origin.

It was the state's theory that the fire was a delayed one, and that a candle was used for the purpose of starting it. It was claimed that the wood shavings were placed in the closet and saturated with fuel oil, and the candle holder containing a lighted candle was then placed thereon and the door to the closet closed. An examination of the electrical wiring in the house showed that the fire had not been started by any short circuit in the wiring system.

To connect the defendants with the alleged crime, the state was compelled to rely entirely upon a chain of circumstances. We summarize the evidence offered in support of the state's theory.

■ A few days prior to the fire, defendants planned a trip to Tacoma or Port Orchard, or both cities, in the state of Washington, over the weekend commencing May 15. They planned to take all the children with them. On Thursday evening, May 14, defendants partially loaded their 1952 Oldsmobile car with some of the things they were to take with them on the trip. On the morning of May 15, the defendant Neva Molitor used the family car to take her husband to the P & G Cabinet Shop in Lebanon, where he was employed as a cabinet maker. The distance from his home to his place of employment was approximately 14 miles. Mrs.

Molitor then returned home. During the day she cleaned house and finished packing for the proposed trip. About 4 p.m. she met the children at school (Sally at the high school) and took them home. Sally changed clothes, did a few chores around the house, assisted in locking the doors and turning on electric lights to be left burning during their absence, but by 4:30 p.m. they were ready to leave. The smaller children had been left in the car, which was then standing in the driveway toward the front of the house, while Mrs. Molitor and Sally were completing final preparations for leaving. Electric lights were left burning in the rear bedroom and in the front portion of the house. The doors all were locked. According to Sally, after they were ready to leave, Mrs. Molitor directed her to change the clothes of one of the small children in the car, and then Mrs. Molitor alone re-entered the house and remained therein for a period of 10 or 15 minutes. It was the state's theory that it was during this period of time that Mrs. Molitor set the scene for the fire in the closet and spread the oil and gasoline throughout the house. Mrs. Molitor denied that she spent that time alone in the house and testified that until the final moment of leaving, she and Sally were together, and left together. However, it was for the jury to decide which one was telling the truth. If they found that Mrs. Molitor was the false witness, a strong inference of guilt would arise when that was considered along with all the other facts and circumstances of the case.

After leaving the home and stopping briefly at one or two places in Sweet Home, Mrs. Molitor drove the car to Lebanon where they met Mr. Molitor at his place of employment. The family then proceeded to a dry cleaning establishment in Lebanon where they secured

possession of several articles of clothing, including dresses and coats, which were placed in the trunk of the car. They then left on their trip. They stopped at Jantzen Beach in Portland for a short time, and then drove on to Port Orchard, arriving there at 2 a.m. on May 16. They remained in Port Orchard until Sunday afternoon, when they left for home. On the way to Portland they decided to remain in that city overnight. In addition to caring for Wanda and Sally, Mrs. Molitor had also been giving daytime care to a small child whose mother was employed in Sweet Home. It was agreed that Sally should call her boy friend at Sweet Home and ask him to convey a message to the child's mother that Mrs. Molitor would not be able to call for the child the next day until about noon. They stopped at a motel near Portland and Sally immediately placed a long distance call for her friend in Sweet Home. She did not talk to the boy friend, but did talk to his father. It was then that she and defendants were informed of the fire. They gave up their motel accommodations and immediately returned to Sweet Home.

There was testimony to the effect that defendants had packed and taken on their trip to Port Orchard an extraordinary amount of extra bedding, clothing, and valuables, much more than would reasonably be necessary for a visit of such short duration.

In the place where defendant Kermit Molitor worked, large quantities of wood shavings accumulated from time to time. A sample of these shavings was compared with the remains of the shavings at the scene of the fire and was found upon analysis to be similar. At a hearing held in Eugene, with a court reporter present, Mr. Molitor, when being asked about the use of shavings, said that they (the defendants) would

occasionally use them for mulch for garden purposes. He maintained, however, that no such use of shavings had been made by them at Sweet Home, and denied that he had taken any shavings to his residence in Sweet Home.

The evidence disclosed that the fuel tank which fed the oil heater had become empty a day or so before May 15, and that Kermit Molitor had purchased five gallons of such oil for use at the home. He claimed that he had poured this oil into the fuel tank, but that tank was empty at the time of the fire. Defendants also admitted that there was a supply of gasoline on the premises.

Prior to the date that the $10,000 policy of insurance was taken out on the dwelling house, to-wit, on April 3, 1953, the Wests had commenced a suit for foreclosure of their mortgage on the premises, the defendants having been served with summons in said suit. A demurrer was filed by defendants to the complaint in foreclosure, but eventually their default was entered in the suit, a decree of foreclosure was awarded the plaintiffs, and the property was sold pursuant to the decree.

Shortly after the fire, defendants filed proofs of loss with the insurance companies. These proofs of loss were verified by defendants under oath. With respect to the dwelling house, defendants in their proofs of loss claimed its cash value to be $19,500, although but eight months before they had purchased the premises for $9,000, land included; they claimed a total loss of $4,925. As to the personal property, defendants claimed a cash value at the time of loss of $5,543; they claimed a total loss of $4,153.35. Very little personal property was burned except that located in the closet, rear bedroom, and bathroom, although

a considerable amount of furniture and other household equipment in other parts of the house was badly damaged from the heat and smoke. An itemized schedule of the personal property claimed to have been lost or damaged was attached to the proof of loss. This schedule showed the date the article was purchased, its original cost, the actual cash value at time of fire, and the loss claimed. Much of the furniture and equipment set forth in the schedule had been purchased at auction sales. From the evidence, the jury could well have found that the original cost figures set forth were untrue, as well as the actual values at the time of the fire. For example, claim is made relative to a rug in the living room. The original cost is set forth as $500, the actual cash value at the time of fire as $450, and the loss claimed as $450. Mrs. Molitor, as a witness, admitted that they had paid but $100 for this rug, and that it was bought at auction.

█ It was the state's theory that defendants planned the fire and executed their design for the purpose of capitalizing on their insurance coverage. That was the claimed motive for the crime. It was a material link in the chain of circumstances. The evidence as to the proofs of loss was very material. *People v. Sevine,* 85 Cal 39, 22 P 969; *O'Daniel v. State,* 188 Ind 477, 123 NE 241; *Stitz v. State,* 104 Ind 359, 4 NE 145; 4 Am Jur 114, Arson, § 67. The evidence tended to show that defendants were not only greatly overinsured at the time of the fire, but also that their claims of loss were grossly exaggerated. Both defendants joined in executing the proofs of loss. It too was most significant that defendants took out the additional insurance on the dwelling after mortgage foreclosure proceedings had been commenced.

██ We have not attempted to mention all the cir-

cumstantial evidence introduced on the trial, deeming it unnecessary to do so. We are of the opinion that what is stated above is sufficient in and of itself to justify the verdicts of the jury as a matter of law. On an appeal in a case such as this, we are concerned with matters of law only; we do not find the facts. It is the exclusive province of the jury to find the facts, and we are bound by its finding if there is any substantial and competent evidence in the record to support it. We find no error in the submission of this case to the jury for final determination. There was ample evidence in the record to warrant that submission.

Defendants' 8th, 9th, and 10th assignments of error relate to certain evidence admitted over their objections.

One Dr. Homer H. Harris had conducted certain tests as to the burning time of candles. Upon his direct examination as a witness, the following testimony was given:

"Q  Dr. Harris, I wonder if you would—Could you please hand Exhibit 13 [the candle holder] to the Doctor?

"Q  Could you remove that object from the container and observe how the diameter of the candle [state's exhibit 44 being the red candle found in the kitchen of the Molitor home] corresponds to the object?

"MR. JOHANSEN: I will make the same objection, your honor, on the basis of incompetency, irrelevancy and immateriality.

"MR. JOHNS: Now, your Honor, I believe the State certainly is entitled to show how its theory could have been—how this fire could have been carried out, according to its theory of the case.

"THE COURT: The objection will be overruled as to this question. You are inquiring into the circumstances, as I understand you?

"MR. JOHNS: Yes, your Honor.

"THE COURT: The objection is overruled.

"MR. JOHNS: Now, Doctor, how does the diameter of the candle correspond to the diameter of the opening in Exhibit 13?

"A The opening in Exhibit 13 is slightly greater than the diameter of the candle. To place them together, the candle fits in fairly firm.

"Q Then Exhibit 13 could hold a candle of that same diameter?

"A In my opinion, it could."

The foregoing forms the basis of defendants' assignment of error No. 8. We do not discuss it now because largely the same question is raised as to this assignment of error as is raised in connection with assignments of error numbered 9 and 10, and we will treat the three assignments together.

Assignment of error 9 is based upon the following testimony of Dr. Harris:

"Q Now, Doctor, have you any knowledge as to the burning time of the candle which you hold in your hand?

"MR. JOHANSEN: I make the objection on the basis of incompetency, irrelevancy and immateriality. I think the Court's previous ruling would cover this situation.

"THE COURT: I don't know that the witness is qualified to answer that question, Mr. Johns.

"MR. JOHNS: I will ask if he has any knowledge concerning, which would go to that.

"THE COURT: He may answer whether he has any knowledge.

"MR. JOHNS: Q Do you have, Doctor?

"A Of this very candle I do not.

"Q Have you examined the composition, taken any samples of the composition of that candle?

"A Yes, I have.

"Q And do you know what ingredients there are in that candle?

"A I know it is primarily paraffin and a small amount of material to increase the melting point somewhat, stearic acid.

"Q What kind of acid?

"A Stearic acid. It is a fatty acid that comes from any animal type of fat.

"Q Now, have you performed tests with candles of the same ingredients?

"A Yes, I have.

"Q Tests as to the burning time?

"A Yes, I have.

"Q And from performing those tests, could you say what the burning time of a candle of this diameter and composition would be?

"A I measured it.

"MR. JOHANSEN: I am going to make an objection to this on the basis of incompetency, irrelevancy and immateriality. The burning time of that candle is not material to this case at all. Such testimony would be entirely incompetent and irrelevant.

"THE COURT: The examination of the witness has gone to the extent, Mr. Johansen, that his answer to this next question would be competent as a circumstance in the case; therefore, your objection will be overruled.

"A The tests that I performed were used, consisted, in this instance, of measuring the burning time of candles having a diameter of one and 3/10 inches; and I found in the samples that I used, that they burned at the rate of approximately one inch every two hours."

Assignment of error 10 charges the court with error in admitting in evidence exhibit 44, being the red candle

found in the Molitor home, and discussed in the testimony of Dr. Harris, supra.

■ Considering the state's theory as to how the fire was caused, and particularly its claim that it was a delayed fire, it was not only proper but also necessary for the state to show that there were candles available of a size that would fit in the candle holder found in the debris removed from the bedroom closet after the fire. As a sample of such a candle, it was competent for the state to produce the red candle found in the Molitor home, or any other candle of similar size. Obviously, the particular red candle found in the home immediately after the fire was not the candle used in starting the fire, if in fact a candle was used. Yet it was necessary and proper for the state to show that a candle which fitted in the candle holder could have been used, and that the use of such a candle probably accounted for the time elapsing between the departure of Mrs. Molitor and children from the home and the time the fire was discovered. Clearly, such evidence was competent, relevant, and material in establishing the state's theory. Both defendants testified upon the trial, yet neither of them explained anything about the alleged candle holder found in the closet; neither denied that it was a candle holder.

■ The burning time of candles was also material, although hardly a matter for expert testimony. It is a matter of common knowledge that candles burn slowly, and that the time it takes to burn them down depends in large measure upon their size and length. The state's evidence simply showed that a candle of the type, size, and length of exhibit 44 burned at the rate of one inch in each two-hour period of time. That merely demonstrated that there were in existence candles that could be, and one of which probably was,

used to delay the start of the fire. Having established the probability of the use of a candle in producing the delayed fire, testimony respecting the burning time of particular candles was not necessary to the state's case, yet it cannot be said that such evidence was wholly incompetent, irrelevant, and immaterial. That was the general objection made by defendants to the offered testimony. However, on this appeal defendants now contend that the testimony of Dr. Harris respecting the result of the tests he made as to burning time of candles was inadmissible because the state did not first show that the experiments had been conducted under conditions substantially similar to those prevailing at the time and place of the fact in controversy, citing in support of their contention the recent decision of this court in *Tuite v. Union Pacific Stages, Inc.,* — Or —, 284 P2d 333. However, defendants asserted no such ground of objection at the time of trial. This court has uniformly held that it will not consider any ground of objection on appeal that has not first been presented to the trial court; in other words, we will not consider any ground of objection that is first raised here. There are exceptions to the rule, but such exceptions are not applicable in this case. For example, in criminal cases where palpable and prejudicial error has occured on the trial of an accused, we have at times taken notice thereof even though no objection was made or exception taken. *State v. Bouse,* 199 Or 676, 685, 264 P2d 800. However, those occasions were indeed rare and always involved unusual and extraordinary situations. Moreover, it is doubtful that the tests made by Dr. Harris with respect to the burning time of candles are experiments of the type necessary to bring them within the rule announced in the Tuite case.

Further, under all the facts and circumstances

of this case, it was not error for the court to admit as evidence state's exhibit 44. Defendants admitted that they kept candles in their home, and exhibit 44 was one of such candles found in the kitchen immediately after the fire had been extinguished.

It was the state's theory that defendants planned the trip to the state of Washington at the time they did so in order to provide themselves with an alibi as of the moment the fire occurred. From the verdicts of the jury it is evident that they planned too well; they left behind too many obvious links in a chain of circumstances that defeated their purpose of committing "a perfect crime", if, in fact, there is such thing. We find no prejudicial error in the record.

The judgment is affirmed.