Argued December 5, 1961, affirmed January 17, 1962

# STATE OF OREGON *v.* PAQUIN
368 P. 2d 85

*William E. Hurley* and *Walter H. Evans, Jr.*, Portland, argued the cause and submitted the brief for appellant.

*Oscar D. Howlett,* Deputy District Attorney for Multnomah County, Portland, argued the cause for respondent. On the brief were Charles E. Raymond, District Attorney for Multnomah County, and Charles R. Harvey, Deputy District Attorney, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Edward A. Paquin, from a judgment of the circuit court, based upon the verdict of a jury, which adjudged him guilty of the crime of arson (ORS 164.020) and sentenced him to a term in the Oregon State Penitentiary. The indictment charged that the structure which was the subject of the purported crime was "a certain multiple dwelling house situated at 732 S. W. Twelfth Avenue in the City of Portland * * *."

The defendant presents the following five contentions as the basis for his appeal.

"The defendant by virtue of the prior trial had already been in jeopardy and as a result the present judgment cannot stand."

"There was not sufficient evidence to establish the corpus delicti."

"In numerous instances improper evidence was received."

"The defendant was denied a fair and impartial

trial since prejudicial statements were made in the presence of the jury."

"The conviction of defendant violated the due process clause of the Oregon Constitution and the Constitution of the United States."

The fifth contention was submitted only because of the defendant's insistence. Defendant's counsel was court appointed and did not participate in the circuit court trial.

The brief of defendant's counsel, in referring to the first and third of the above contentions, states:

"With respect to some of the errors above referred to (particularly (1) and (3), supra), it will appear that no objections or exceptions were taken. The defendant will, however, ask the court to examine and pass upon the errors since it appears from the records before this court that defendant's counsel below was inexperienced *  *  *."

■ We read the entire transcript of evidence and examined with care the two contentions just mentioned. We are satisfied that they are without merit. Since no objection was made in the trial court when the developments occurred which underlie these two contentions we deem it unnecessary to set forth at length the reasons which prompt us to rule that the contentions lack merit. The first of the two, that is, the one pertaining to double jeopardy, is based upon the fact that the defendant had been previously tried upon the same indictment and the jury had failed to reach a verdict. The record contains a statement by the late Circuit Court Judge, Frank J. Lonergan, who presided over the first trial of the defendant. It states:

"The jury informed the court that it was hopelessly divided, and that it was impossible for said jury to agree upon a verdict, and the court, being

fully satisfied that said jury was hopelessly divided, and that said jury would continue to be unable to agree upon a verdict, and that there was no probability whatever that a verdict could be reached by said jury and that said jury should therefore be discharged from further consideration of this cause * * * ."

The judge thereupon discharged the jury. A finding by a trial judge that a jury is unable to agree is, according to *State v. Chandler,* 128 Or 204, 274 P 303, "absolute and conclusive." Judge Lonergan's statement recites that the defendant and his attorney "both being present," that is, when the jury was discharged. As we said, no objection was made to the jury's discharge and no exception was taken to Judge Lonergon's ruling. The defendant entered no plea of double jeopardy as is required by ORS 135.820 of those who intend to offer a defense of this nature.

The third contention which is based upon a charge that "improper evidence was received during the course of the trial" induced us to give attention to the various instances which appellant's brief mentions. We do not believe that reversible error is shown by any of them.

We will now consider the second of the above enumerated contentions, that is, the one that charges "there was not sufficient evidence to establish the corpus delicti." The defendant, as a witness in his own behalf, freely admitted that the structure which is described in the indictment took fire; he stated that the fire occurred June 8, 1960, at about 3:30 or 4:00 p.m. The indictment specifies the day of the fire as June 8, 1960, and the state's witnesses fixed the hour at substantially the same time as the defendant. The fire did not destroy the structure. It was confined largely

to a single room known as a storeroom. That room was badly charred. Consequently, the burning which is one of the components of the crime of arson is established. But, it was incumbent upon the state, in addition to proving the burning, to show that the fire was caused criminally.

The structure which was the victim of the fire was, according to one of the witnesses, "an old building." It stood near to the business area of Portland. It was four stories high and at least two of its stories had ceilings substantially higher than structures which are built today. Photographs of parts of its interior indicate that in its heyday this building possibly was an important edifice. One of its features was an imposing central staircase that ascended from the first to the top floor. By the time of the fire the old structure had slumped in importance and was used for nothing more important than housekeeping apartments. It contained 25 of them. All except one was rented at the time of the fire.

June 4, 1960, the defendant moved into the building. He was hired on that day by the owner of the apartment venture as the manager of the apartments. He was then 24 years of age. June 8, as we have said, the fire occurred.

We have mentioned the imposing staircase that ascended from the first to the top floor of the building. When it reached a point about half way between the third and fourth floors it interrupted its climb with a level area in the nature of a landing before it continued its ascent to the top floor. A door opened from the landing into a shallow storeroom, four feet high and thirteen feet long by fourteen feet wide. It contained trunks, cardboard cartons, eight discarded

doors, two stepladders and various items in the nature of cast offs. The state claims that the fire originated in this room and that the defendant set it.

The record, as we shall see, contains evidence, unchallenged on appeal, showing that the defendant confessed that he ignited this fire willfully and maliciously. ORS 136.540 (1) provides that a confession alone does not suffice to establish the corpus delicti. Its words are:

"* * * nor is a confession only sufficient to warrant his conviction without some other proof that the crime has been committed."

■ It will be noticed that ORS 136.540 does not withhold from a confession status as evidence in cases of this character. The section provides that if the prosecution depends upon a confession the latter does not suffice "without some other proof." However, if the confession is corroborated it may be weighed and considered by the jury in determining the defendant's guilt. *State v. Schleigh,* 210 Or 155, 310 P2d 341. The "other proof" need not identify the defendant as the guilty person, but must indicate that "the crime has been committed."

The morning following the fire the defendant and his wife called at the offices of the Portland fire department and shortly the defendant was interviewed there by a member of the police department who had the status of detective. Before long the defendant, according to the state, confessed that he set the fire. Upon that development the defendant, his wife and the detective went to police headquarters where a tape recording was made of the interview that took place there. Still later the part of the interview which constituted the confession was transcribed. After it was

transcribed the defendant read and signed it. We quote from it the following:

"Q And there was a fire there yesterday at about 3:30 in the afternoon—is that right?

"A Yes.

"Q Now, we have had conversation about this before—I understand that you were responsible for that fire—is that right?

"A Yes.

"Q Where did the fire start?

"A It started between the 2nd and the 3rd floor, in a little compartment where they keep supplies and stuff.

"Q In a little storage closet-type thing?

"A Yes.

"Q How did you start the fire—did you . . . I assume you lit a match and started it . . . but what did you set afire first with the match?

"A A box of paper and glass there—I just lit a match to the glass and paper.

\*    \*    \*

"Q Can you tell me why you set that fire.

"A Well I was depressed and my wife didn't want to work in the apartment building—she kept on hounding me about it and telling me that she did not want to work there and so I told her I said well, lets keep it up—I said it will last a month and I don't know, everything just kept building up; the people downstairs they just kept complaining every time we done something wrong, like if we went outside to a show or something like that, they would tell the manager that was over us that we went to the show or we went to church or we went to this place or that place and it kept just getting on my nerves I think.

"Q Well, then your feeling might be described

as saying that you just didn't hardly have any other course of action—is that right?

"A Yes."

The trial judge, after giving careful attention to the issue, ruled that the confession was admissible. No contention presented upon appeal challenges that ruling.

We come now to the question as to whether the record contains "some other proof" in addition to the confession showing that "the crime has been committed." We took the words enclosed in quotation marks from ORS 136.540.

■ Those who commit the crime of arson usually do not do so in the presence of a group of people of good moral character who will be available to the state as witnesses when the defendant's prosecution gets under way. The crime, when committed, is perpetrated ordinarily in stealth and secrecy. ORS 136.540 (1), as we have seen, does not permit the state to rest its case upon the defendant's confession, if the defendant actually confessed, but exacts of the state "some other proof" showing that the crime took place. But in submitting this "other proof" the state does not encounter any novel rules of evidence nor need this "other proof" be so cogent that it alone would warrant a finding of guilt. *State v. Schleigh,* supra.

It is frequently necessary in cases of this kind for the state to resort to circumstantial evidence in order to establish its case. An item of circumstantial evidence which is often persuasive with the layman is the fact, if indeed it is a fact, that the defendant upon noticing that the police suspected him as the arsonist sought to suppress or manufacture evidence. Generally, the innocent do not tamper with the evidence and the witnesses.

One of the police officers who interviewed the defendant and his wife the morning after the fire occurred gave this testimony:

> "I asked her this same question that I had asked Mr. Paquin about the key. I asked her why she had changed her story about the key. She said that she had changed it as a result of a conversation with Mr. Paquin on the night before. She said that they had gone to a hotel down on 4th Avenue and that after—after they went to bed they had talked about it and Mr. Paquin had told her to change the story. That she should tell us that he hadn't had the key."

No objection was made to that testimony. The key to which the testimony referred was to the door which led into the storeroom. According to the testimony, that door was always locked with a padlock and the key to it was kept in the manager's apartment. According to other testimony, a tenant, an hour or more before the fire, had asked for a vacuum cleaner which was kept in the storeroom. The defendant's wife went to the storeroom and obtained the vacuum cleaner. The investigator's knowledge as to whether or not the defendant had the key to the storeroom at the ominous hour was dependent upon the explanation of the defendant and his wife as to what the wife had done with the key.

Wigmore on Evidence, Third edition, § 278, states:

> "It has always been understood—the inference, indeed, is one of the simplest in human experience— that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that

consciousness may be inferred the fact itself of the cause's lack of truth and merit. \* \* \*"

The paragraph then lists as evidence within its embrace the following: "fabrication or manufacture of evidence" and "suppression of evidence." We believe that the defendant's prompt action in inducing his wife to change her explanation concerning the key is evidence that his claim to innocence needed the bolstering of false testimony.

The unchallenged and uncontradicted testimony indicates that the storeroom was kept locked at all times with a key that remained in the manager's apartment unless the manager, or his wife, went to the storeroom. According to the defendant's own testimony, he was in the storeroom ten or fifteen minutes before the fire broke out and while there lighted a match which he discarded in the storeroom.

The testimony of members of the fire department who were assigned to the duty of investigating the cause of fires showed the following:

(1) No heating appliances of any kind were in the storeroom.

(2) No electrical wiring was within several feet of the spot where the fire originated.

(3) The single line of wiring in the storeroom bore no indication that it had started this fire.

(4) No chemicals capable of starting a fire were in this room, and no trace of any such substance could be found in the room after the fire.

(5) This fire was not one that evolved from a smoldering condition such as from the slow burning of a mattress, but was from the outset "a very fast intense fire" that came from an open flame, possibly from a lighted match.

(6) Natural causes did not set this fire.

(7) The fire started in the rear of the room and not near the entrance door where the defendant, while testifying, said he discarded a match.

As a witness testifying in his own behalf, the defendant conceded that he could have started the fire. Referring to the storeroom, the defendant explained:

"* * * I had been in there. What I was doing, I was taking inventory of the material that was in there. Then I was ready to walk out the door. As I was ready to walk out the door, I lit myself up a cigarette. I threw the match away.

"Q When you left you did light a cigarette in there though?

"A Yes, I did.

"Q When you left was there any fire burning?

"A No, there was not at that time.

"Q About how long after that did you notice the fire?

"A Well, I'd been back downstairs at least ten to fifteen minutes.

"Q About ten or fifteen minutes. Then you came back up?

"A Yes.

"Q You have heard this testimony about the key? Did your wife go up and give the vacuum cleaner to Mr. Sheen?

"A Yes.

"Q And she had the key. Did she go up to the closet and get it?

"A Yes.

"Q Then what did she do, do you know? Did she bring the key back down?

"A She brought the key back down and she laid it back on the hook in the apartment where the keys were kept."

Later, apparently for the purpose of clarification, the questioning drew from the defendant statements that after his wife went to the storeroom for the vacuum cleaner and had returned the key to him he

went to the storeroom. His trip there was about fifteen minutes after his wife's return. No fire was burning in the room at that time. While in the storeroom the defendant lighted a cigarette and discarded the match in the storeroom near the door. In fixing the time that he spent in the storeroom he expressed it in these words:

"I wasn't in there no longer than two or three minutes. Maybe five minutes at the most."

While there he observed no fire. Ten or fifteen minutes later the fire was well under way and smoke was entering apartments over the storeroom as well as issuing from the upper part of the building. In fact, the stairway between the third and fourth floors had become so heated that the defendant cautioned tenants who sought to escape from the fourth floor not to use the stairway.

■ The only possible uncertainty as to the fire could be whether its origin was an act of carelessness or a criminal act. It will be noticed that ten or fifteen minutes after the defendant had left the storeroom the fire had reached imposing proportions. It is clear that the fire was one that started and burned with unusual rapidity. The jury could readily have found, as it apparently did find, that the fire did not originate in the match which the defendant said he discarded near the door. The testimony of the fire investigators shows that the fire started in the rear of the storeroom, ten feet or so from the door. As a witness the defendant was impeached by his admission that he had been convicted of four misdemeanors. The fire experts showed with support of pertinent details that the origin of this fire was not in any natural cause but in an intentional act. It is our belief that the record contains the requisite "proof that the crime has

been committed." Our reasoning is in harmony with that set forth in *State v. Schleigh,* 210 Or 155, 130 P2d 341.

The only other contention to which we will give attention is the defendant's that "prejudicial statements were made in the presence of the jury." The statement to which the defendant referred was that he was dishonorably discharged from the armed services. Based upon the fact that his dishonorable discharge came to the attention of the jury the defendant claims that the trial judge erred when he declined to order a mistrial. The statement concerning the dishonorable discharge was contained in the defendant's confession and accordingly, when the latter was read to the jury the defendant's answer that he met with dishonorable discharge came to the jury's notice.

■■ The moment that the development just mentioned had occurred the trial judge, without waiting for action by defendant's counsel, called a conference between counsel and himself. At its close he addressed the jury as follows:

"There is a statement there, ladies and gentlemen, about a bad conduct service discharge from the Army. You are instructed to entirely disregard that statement, that has got nothing to do with this case. Go ahead. If I had known—It should have been brought to the attention of the court before he read it. Go ahead."

Not until then did the defendant move for a mistrial. At that juncture a recess occurred in the course of which the trial judge conferred with counsel. At the close of the conference the trial judge stated:

"Well, the Court believes that its instructions to the jury removed any effect of the statement. I will deny the motion for a mistrial and allow the defendant an exception."

Thereupon, the part of the confession which mentioned the dishonorable discharge was concealed from vision by being covered with paper and Scotch Tape. Whether a mistrial should be declared because of some untoward incident that occurred during the course of the trial rests largely in the discretion of the trial judge. *State v. Roden,* 216 Or 369, 339 P2d 438; *State v. Cunningham,* 173 Or 25, 144 P2d 303; and 23A CJS, Criminal Law, § 1382, page 1023. The state aims to give every defendant a perfect trial, but since the human element plays an important role in the trial of cases, the state realizes that in many instances its ideal of a trial free from all error is unattainable. But, nevertheless, the law is not satisfied if something occurred in the course of the trial which substantially prejudiced the defendant's right to a just verdict. Whenever something of that nature occurs procedure places at the command of the trial judge several courses, any one of which he may adopt. One is to declare a mistrial. That remedy in most instances is drastic. Another is the course which the trial judge adopted. As we have seen, the course to be pursued is assigned largely to the trial judge's discretion. After the court had instructed the jury to disregard the improper item it declared: "The Court believes that its instructions to the jury removed any effect of the statement." In this case the record shows that the trial judge was thoroughly alert to his duty to conduct a trial free from error and free from prejudice. It seems clear that the reading of the improper part of the confession was inadvertent. We do not believe that the defendant's contention that a mistrial should have been declared presents any basis for a reversal of the trial judge's ruling.

The above disposes of all contentions that need attention. The judgment of conviction is affirmed.