Argued November 2, affirmed December 29, 1972

HOWARD, *Appellant, v.* SLOAN ET AL,
*Respondents.*

504 P2d 735

*Raymond J. Conboy,* Portland, argued the cause for appellant. With him on the brief were Pozzi, Wilson & Atchison, and Brian L. Welch, Portland.

*Fred Miller,* Portland, argued the cause for respondent Sloan. On the brief were John J. Higgins and Black, Kendall, Tremaine, Boothe & Higgins, Portland.

*Frank H. Hilton, Jr.,* Portland, argued the cause for respondent Hurrle. With him on the brief were Hutchinson, Schwab, Burdick & Hilton, Portland.

*L. Guy Marshall,* Portland, argued the cause for respondent Bennett. With him on the brief were Marshall & Schwabe and Peter A. Schwabe, Jr., Portland.

*Roger Rose,* Portland, argued the cause for respondent Herndon. On the brief was Atma Singh Mann, Portland.

TONGUE, J.

This is an action for personal injuries suffered by plaintiff as he was driving by defendants' building at the time of an explosion of dynamite in its basement. Plaintiff's complaint alleges that defendants were responsible for the explosion. Plaintiff appeals from a judgment of involuntary nonsuit, based upon a holding by the trial court that plaintiff's evidence was insufficient. We affirm.

The building involved in this case was the Helm Building in Portland. At the time of the explosion it was owned by a joint venture, including defendant Sloan, defendant Bennett and Donald E. Hurrle, who was deceased at the time of trial and whose estate was represented by defendant Dorothy Hurrle as its personal representative. Defendant Herndon, an attorney, was not a member of the original joint venture, but had been a friend of Hurrle for some time and had an oral agreement with him prior to the explosion under which Herndon later received a portion of Hurrle's interest in the building. Herndon was also a tenant in the building.

In 1966 the building was owned by a corpora-

tion in which Hurrle and Herndon were the sole stockholders. In that year the building was sold for $200,000 in cash to Henry Pein, with a lease back to the corporation. Most of that money was apparently used to pay off the balance of a former purchase contract, as well as various bills.

The corporation then encountered financial difficulties and became in arrears in its rental payments. Pein then filed F.E.D. proceedings. Shortly before the "deadline" in those proceedings in February 1968, Hurrle asked Bennett, a "land developer," if he could help. Bennett had no funds to invest at that time, but knew Sloan, who owned a substantial business.

An agreement was then made in February 1968 under which Hurrle, Bennett and Sloan, as a joint venture, repurchased the building from Pein on a contract for $225,000, payable in monthly installments. The only cash paid at that time was approximately $6,000, which was provided by Sloan for payment of pending bills and attorney fees.

At that time the building was insured for $200,-000. As a result of efforts by Bennett, however, the insurance on the building was increased to $350,000 and a policy in that amount was issued by Safeco Insurance Co. There was also some evidence that Hurrle and Herndon participated with Bennett in arrangements for that insurance.

The insurance agent for Safeco testified that he advised against insurance in that amount, although he felt that the insurance should be increased and recommended an increase to $275,000. Bennett testified that he had a written appraisal at $350,000 by an independent appraisal company. The written appraisal, if any, was never produced and the insurance agent testi-

fied that Bennett never told him about such an appraisal.

At about the same time, Herndon also arranged for "business interruption" and "valuable documents" insurance for his law practice. He testified that he did so because of the condition of the building and that he had not previously carried such insurance because his previous offices had been in modern fireproof buildings. Herndon also testified that Hurrle had previously agreed verbally to transfer to him either one-fourth or one-third of "whatever Hurrle salvaged" out of the repurchase of the building.

Upon repurchase of the building Bennett became its manager. He put up no cash to become a member of the joint venture, but testified that he received a one-third interest for "putting the transaction together" and for agreeing to act as manager for an indefinite period of time, so as to contribute his "time and talent" to put the building "back on its feet."

In that capacity Bennett made arrangements for janitorial service, to be performed on Monday, Wednesday and Friday nights. After finding that a janitor worked on a Sunday, Bennett wrote to the janitorial service on April 8, 1968, and requested, among other things, that such services were to be performed "on Monday, Wednesday, and *Friday*; NOT Sunday."

Bennett testified that he decided, as manager, to keep the building vacant on Sundays because on lower Burnside Street, where the building was located, there was a "security problem" with "winos" coming in if doors were left unlocked. He also testified that some tenants who worked in the building on Saturdays and Sundays objected to having janitorial work going

on at the same time. The tenants named by him, however, denied that they had made such objections.

According to the testimony, after its purchase by the joint venture in February 1968, the building became profitable and was operated at a net profit of between $1,000 and $1,500 per month.

Early in the morning of Sunday, June 23, 1968, a muffled blast was heard by a witness who worked across the street and saw dust coming out of the building. At about midnight of that same Sunday a second explosion occurred. At that time plaintiff was driving by the building and he was injured as a result. Experts who investigated expressed the opinion that the explosion was caused by dynamite and appeared to be the work of an expert in building demolition.

A claim was then made by the joint venture to Safeco Insurance Company. That claim was investigated by it at some length. Its building appraiser testified that the building had a value of $216,300 at that time. The insurance company, however, paid $250,000 to members of the joint venture for destruction of the building and $20,000 for loss of rental insurance. Virtually all of that money was expended to pay off the purchase contract, as well as various bills. As a result, however, members of the joint venture retained the building site free and clear of all encumbrances and have used it since as a commercial parking lot. It was admitted by Sloan, in response to a leading question, that this result was an "economic bonanza."

In accordance with the previous oral agreement, Hurrle transferred to Herndon a portion of his interest in the joint venture. The insurance company also paid $1,500 to Herndon in settlement of his claim for the "business interruption" of his law practice. Hern-

don had also previously been having financial difficulties.

There was some additional evidence, which we have also examined, but none of great importance, in our opinion. No testimony, however, was offered to directly connect any of the defendants with the explosion itself, either by their presence in or near the building on that day, or on any particular previous day, or by participation in the procurement, storage, or use of dynamite, or by association with any other person who might have been responsible for the explosion.

On the other hand, the testimony was that not only all of the defendants, but all tenants as well as the janitor, had keys so as to have access to the building. Also, at that time, according to the testimony, anyone could purchase dynamite. The only remote evidence on that subject was that Hurrle had an interest in a sand and gravel company with a gravel pit (not a rock quarry).

■ Plaintiff is correct in stating that arson and related offenses must usually be proved by circumstantial evidence. *State v. Paquin,* 229 Or 555, 562, 368 P2d 85 (1962). It is also true that in reviewing the sufficiency of the evidence in this case we are required to assume the truth of the evidence offered by the plaintiff and he is entitled to the benefit of all reasonable inferences from such evidence. *Cronn v. Fisher,* 245 Or 407, 416, 422 P2d 276 (1966). The question remains whether, assuming the truth of plaintiff's evidence in this case, an inference from that evidence that defendants were responsible for the explosion was a reasonable inference, as a matter of law.

As stated in *Ehler et ux v. Portland Gas &*

*Coke Co.,* 223 Or 28, 38-39, 352 P2d 1102, 353 P2d 864 (1960):

"Where one relies upon circumstantial evidence from which reasonable deductions may be drawn to establish a fact by inference, the inference 'must also be sufficiently persuasive to negative all rival conclusions suggested by itself and which show nonliability in the opponent. For instance, if at the close of the presentation of proof the circumstantial evidence is capable of supporting with equal reason two or more conclusions, one or more of which prove the nonliability of the opponent, the proponent has failed to discharge the burden of proof * * *.'

"It has been previously decided that when there are two possible deductions, the burden is met if the proponent presents evidence showing 'that the favorable inference is the most logical.'" (Citations omitted).

Plaintiff contends that "[e]vidence of financial embarrassment, overinsurance, and opportunity, when added to proof of deliberate destruction of property have often been held sufficient to establish *criminal* responsibility, without specific proof connecting the defendant to the offense." The only authorities cited by plaintiff in support of this contention, however, are *State v. Molitor et ux,* 205 Or 698, 289 P2d 1090 (1955), and *State v. Director,* 113 Or 74, 227 P 298, 231 P 191 (1924).

In *Molitor,* as in this case, there was "evidence of financial embarrassment, overinsurance, and opportunity." In addition, however, there was evidence that on the day before the fire occurred the defendants took a trip. After preparing to depart for the trip the wife returned to the house and remained there alone for approximately 10 minutes while the children

were in the car. There was testimony that the defendants took an extraordinary amount of bedding, clothing and valuables for such a short trip. In addition, the wood shavings found to have been used to start the fire were similar to wood shavings found at the husband's place of employment. Also, a day or so before the fire, the husband purchased five gallons of oil, which he allegedly put in an oil heater, but the heater was empty at the time the fire occurred and there was a strong odor of fuel oil. Thus, in *Molitor* there was evidence connecting defendants with the means used to start the fire, as well as evidence of their presence at the building at a time when the arrangements for the starting of the fire would likely have been made. There was no such evidence in this case.

Similarly, in *Director* there was not only evidence of "financial embarrassment, overinsurance and opportunity," but also evidence that defendant was inside the building when the fire broke out and was responsible for the storage of a quantity of kerosene in the building at that time, as well as evidence that there was an odor of kerosene during the fire and that afterwards the tank in which it had been stored was empty.[1]

Again, there was no evidence in this case that any of the defendants was physically in the building on either the day of the explosion or on any day shortly preceding it or to connect them with any other person or persons who may have been responsible for the explosion. There was also no substantial evidence

[1] In Nat. Bank v. Fire Association, 33 Or 172, 187, 50 P 568, 53 P 8 (1898), and in State v. Zorner, 4 Or App 84, 89, 475 P2d 990 (1970), there was also similar additional evidence.

to connect any of the defendants with the acquisition, storage or use of dynamite.

■■ Plaintiff correctly states that *Molitor* and *Director* were criminal cases, in which the burden of proof is heavier than in a civil case such as this. No cases have been cited by plaintiff, however, either criminal or civil, in which evidence of "evidence of financial embarrassment, overinsurance and opportunity," have been held to be sufficient in arson or explosion cases without much stronger additional evidence to connect the defendant with the offense charged. See, however, 21 Appleman, Insurance Law and Practice 639-640, § 12682 (1962), and cases cited therein. See also 19 Couch on Insurance 2d 841-49, §§ 79:561-79:570 (1968). This is also consistent with the usual rule that suspicion alone is not sufficient and that while evidence of motive may be admissible, such evidence is not, of itself, sufficient to establish that the defendant in fact committed the act which he had a motive to commit.

Plaintiff says that in this case there was also "independent testimony that defendant Bennett testified falsely on two material issues of fact" and that under *State v. Carroll*, 251 Or 197, 444 P2d 1006 (1968), this "will support a finding against the foreswearing party." In *Carroll*, however, the issue was not whether false testimony would of itself be sufficient to support a finding that defendant was guilty of the crime charged, but whether it was sufficient to satisfy the requirement that when, as in that case, testimony of guilt was supplied by an accomplice there must be some corroboration of such evidence.[2]

---

[2] Plaintiff also cites State v. Paquin, 229 Or 555, 368 P2d 85 (1962), in which the problem was similar in that the issue was

■■ The general rule, of course, is that the fact that a defendant lies does not, taken by itself, prove that he is guilty. See 1 Wharton, Criminal Evidence (12th ed 1955) 268, § 143. The allegedly false testimony by Bennett was that the building had been appraised for $350,000 and that tenants objected to janitorial services on Sundays. In our opinion the fact that Bennett gave false testimony on these matters was not sufficient, when added to "evidence of financial embarrassment, overinsurance and opportunity," to support a finding of liability in this case in the absence of additional evidence to connect defendants, or any one of them, with the explosion.

Plaintiff also contends that there was sufficient evidence of liability in this case upon two theories: (1) that of "absolute liability for storage and use of dynamite, an ultrahazardous substance" and (2) the theory of "negligence *per se* for violation of the Oregon Safety Code for Explosives and Blasting Agents by the presence of dynamite in the Helm building." Plaintiff contends that upon proof that dynamite was present in the building and used to destroy it, as well as proof of defendants' ownership and control of the building, plaintiff made a prima facie case under either of these theories and that the burden of producing "exculpatory evidence" then passed to the defendants. In support of this contention plaintiff cites *Bedell et ux v. Goulter et al*, 199 Or 344, 261 P2d 842 (1953); *Ainsworth v. Deutschman*, 251 Or 596, 446 P2d 187 (1968); *McConnell v. Herron*, 240 Or 486, 402 P2d 726 (1965);

whether there was sufficient evidence to corroborate defendant's confession. State v. Jennings, 48 Or 483, 87 P 524, 89 P 421 (1906), and 2 Wigmore, Evidence (3d ed 1940) 120, § 278, also cited by plaintiff, do not state a contrary rule.

and *Pozsgai v. Porter,* 249 Or 84, 91, 435 P2d 818 (1968).

■ We held in *Bedell,* as contended by plaintiff, that one who stores and uses dynamite on his premises is absolutely liable for injury to third persons. Also, the Oregon Safety Code for Explosives and Blasting Agents includes the following provision as § 13-4-1:

> "All explosives are defined in this Code, including special industrial high explosives and any newly developed and unclassified explosives, shall be *stored* in either a First-Class magazine or in a Powder Box, *except while being transported or in use.* * * *"* (Emphasis added)[9]

■ We have also held in *Ainsworth, McConnell* and *Pozsgai,* although under far different facts, that upon proof that a defendant has violated a statute or safety regulation, the burden may then shift to the defendant to excuse the violation, if he can do so. (See also more recent decision in *Barnum v. Williams,* 264 Or 71 (December 14, 1972).)

■ In this case, however, there was no evidence that any of the defendants had anything to do with the procurement, storage, or use of the dynamite which exploded and injured plaintiff or that they had anything to do with any dynamite. In the absence of such evidence we hold that there was no shifting to defendants of either the burden of proof or the burden of going forward with the evidence and that plaintiff's evidence was insufficient under either of plaintiff's theories in this case.

For these reasons, we agree with the trial court

---

[9] This safety code has now been superseded by The Oregon Safety Code for Explosives and Blasting Agents, Administrative Order FM 38 (1970).

that all defendants were entitled to the entry of a judgment of involuntary nonsuit.

Affirmed.